MEADOR & ENGLE
Alan Engle (SBN 224779)
alan.engle@meenlegal.com
155 N. Riverview Dr., Suite 313
Anaheim Hills, CA 92808
Telephone: (310) 428-6985
Facsimile: (714) 386-5368
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ASHMAN, an individual; BRAD BOOTH, an individual; THOMAS KORAL, an individual; GREG LAVERY, an individual; DAVE LIZMI, an individual; DANIEL SMITH, an individual; JOSEPH SANDERS, an individual; and DUSTIN WOOLF, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>6356095 CANADA, INC. (aka EXCAPSA SOFTWARE, INC.), a Canadian corporation; AND DOES 1-10,<br><br>Defendants. | Case No.: **CV12 - 0342 DSF (JCx)**<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR: (1) RICO (18 U.S.C. § 1961 ET SEQ.); (2) RICO CONSPIRACY (3) CONVERSION; (4) INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (5) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; (6) UNFAIR BUSINESS PRACTICES (CAL BUS. & PROF. C. § 17200 ET SEQ.); (7) FRAUD; AND (8) NEGLIGENCE |

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

Plaintiffs allege, with knowledge as to their own actions and actions taking place within their presence, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiffs are high-stakes online poker players who were cheated at UltimateBet.com.  They bring this action against 6356095 Canada, Inc. (formerly Excapsa Software, Inc.) and Does 1-10 for (1) Violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.); (2) Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act; (3) Conversion; (4) Interference with Prospective Economic Advantage; (5) Intentional Infliction of Emotional Distress; (6) Unfair Competition and Fraudulent Business Practices (Cal Bus. & Prof. C. § 17200 et Seq.); (7) Fraud; and (8) Negligence.

2.      UltimateBet (aka Ultimatebet.com) is an online poker and gambling website that has and continues to serve players in the United States.  6356095 Canada, Inc. (formerly Excapsa Software, Inc. or "Excapsa") and Does 1-10 are holding companies, licensing entities, marketing companies, software firms, and individuals organized in or residing in jurisdictions throughout the world that developed software for and/or operated UltimateBet by and through which owners of Excapsa sought to direct and shield its illegal and fraudulent activities from courts, police, and tax authorities. Individual Doe defendants are owners, operators, officers, employees, and/or agents of Excapsa.  While UltimateBet is not itself a legal entity, it is the vehicle through which defendants operated various conspiracies to defraud plaintiffs and the broader public.

3.      Since at least June 2003 and until at least January 2008 Excapsa/UltimteBet did conspire to and did direct, effect, and permit the theft of over $2,000,000 held in plaintiffs' online poker accounts at UltimateBet.com.  Specifically, by creating and making use of an intentional a security flaw in the UltimateBet.com software, and with the assistance of owners, agents, and employees of Excapsa and its various subsidiaries that operated UltimateBet, defendants either allowed others to or did directly view plaintiffs "hole cards" during high-stakes poker matches run at UltimateBet.com.

4.  With the assistance of owners, operators, officers, employees, and/or agents of Excapsa and its subsidiaries, the cheaters were further able to change their online identities to avoid detection and to improperly funnel their illicit proceeds through various UltimateBet accounts in a manner that would have been impossible without insider assistance.  Through these activities, defendants stole or caused to be stolen at least 20 million dollars from plaintiffs and other high-stakes poker players at games run by UltimateBet.

## JURISDICTION

5.  This Court has jurisdiction in this action under the Organized Crime Control Act of 1970, 18 U.S.C. § 1964 (a) and (c) (Racketeer Influenced and Corrupt Organizations); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity); and under the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

## VENUE

6.  Personal jurisdiction and venue in this action are predicated on 18 U.S.C. § 1965(a) and 18 U.S.C. § 1965(a) and (c), based on defendants' activities within and directed toward this jurisdiction, including but not limited to the operation of UltimateBet.com, an online gambling operation deriving the majority of its revenue from citizens of the United States, including citizens within this District.

## STANDING

7.  As described herein, Plaintiffs have standing to bring these actions under 18 U.S.C. § 1964(c) as persons who have been injured in their business or property, and under California Code of Civil Procedure § 17204, as persons who have suffered injury in fact.

## THE PARTIES

8.  Plaintiff Daniel Ashman is an individual and a resident of Cambridge, Massachusetts.

9.  Plaintiff Brad Booth is an individual and a resident of Vancouver, British Columbia, Canada.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

3

10. Plaintiff Thomas Koral is an individual and a resident of Skokie, Illinois.

11. Plaintiff Greg Lavery is an individual and a resident of Madison, Wisconsin.

12. Plaintiff Dave Lizmi is an individual and resident of Baltimore, Maryland.

13. Plaintiff Joseph Sanders is an individual and resident of Lima, Peru.

14. Plaintiff Daniel Smith is an individual and a resident of Bethesda, Maryland.

15. Plaintiff Dustin Woolf is an individual and a resident of Los Angeles, California.

16. Defendant 6356095 Canada, Inc., formerly known as Excapsa Software, Inc., is a company incorporated and registered in Canada. It was formerly the holding company for Excapsa Services, Inc., Game Theory Ltd., Game Theory Holdings Ltd., and Game Theory Services, Ltd and other subsidiaries. On its own and by and though its subsidiaries, Excapsa Software operated and derived profits from the UltimateBet.com online poker website. Excapsa Software is currently undergoing voluntary liquidation under the direction of XMT Liquidations, c/o WSBG, LLP, 1155 Rene Levesque Blvd., Suite 2010, Montreal, Quebec, H3B 2J8.

17. At this time, Plaintiffs suspect but do not know the identities of DOES 1-10. Evidence, some of which is discussed below, has arisen that some of the founders and management of UltimateBet and Excapsa, including Greg Pierson, Jon Karl, Jack Bates, Russ Hamilton, and others who formerly operated (and may continue to be involved in the operation of) UltimateBet were likely aware of or involved the conspiracy to cheat players. However, because the identities and activities of UltimateBet and those who have profited from its operations has been intentionally shielded though numerous agents, subsidiaries, and foreign corporations, it will be necessary to conduct significant discovery before a complete list of defendants can be identified. After such discovery, Plaintiffs will seek to amend the Complaint to add additional defendants.

## BACKGROUND AND FACTS

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4

18.     This case concerns the UltimateBet.com online poker cheating scandal, in which plaintiffs and other high-stakes online poker players were cheated out of millions of dollars in crooked online poker games where their opponents (employees, agents, owners, and/or officers of Excapsa/UltimateBet) had illicit access to players "hole" cards. Plaintiffs unknowingly played games of high-stakes poker with their cards essentially face-up. The facts underlying the case have already been the subject of intense public interest and media scrutiny, including a feature story on 60 Minutes,[1] an investigative series by the Washington Post,[2] a feature article by MSNBC,[3] and hundreds of articles and news reports across the internet.

19.     Plaintiff in this action are or have been high-stakes poker players, both live and online. Various plaintiffs have been featured in television programs, magazine articles, documentaries, and thousands internet news reports. They have written poker books, appeared on ESPN, won major poker tournaments, and have influenced the evolution of poker both live and online.

ULTIMATEBET.COM

20.     Online poker has a popular pastime for millions of people in the United States and around the world. While barely a decade old, online poker is already a multi-billion dollar industry, with revenues growing from $82.7 million in 2001 to approximately $5 billion in 2008. The stakes of real money online poker games can range from as little as $0.02 to as much as thousands of dollars per hand. While most online poker players participate in small stakes recreational games and tournaments, plaintiffs are drawn from the elite group of high-stakes online players.

21.     UltimateBet was and is one of the most popular online poker sites. According to pokerscout.com, an online poker tracking site, the Cereus Network

---

1   60 Minutes, "Poker Face," original air date November 30, 2008, available at www.cbsnews.com/video/watch/?id=4639016n.

2   Gaul, G.M., "Players Gamble on Honesty, Security of Internet Betting," *Washington Post*, November 30, 2008, available at www.washingtonpost.com/wp-dyn/content/article/2008/11/29/AR2008112901679.html.

3   Brunker, M., "Poker Site Cheating Plot a High-Stakes Whodunit," MSNBC.com, Sept. 18, 2008, available at www.msnbc.msn.com/id/26563848/.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(launched in 2008 as a result of the merger of UltimateBet and Absolute Poker) is the fifth most popular online poker venue.[4]

22.     The history, ownership, and business structure of UltimateBet are cloaked in layers of obscurity as a result of intentional efforts by the individuals profiting from the enterprise to avoid scrutiny.  This is hardly surprising as the prospect of criminal prosecution under the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 USC 1955, RICO, 18 U.S.C. § 1961, *et seq*., and similar statutes has haunted operators of internet gambling sites from their inception.  In 2011, a Grand Jury in the Southern District of New York returned an indictment against the current owners of UltimateBet (Scott Tom and Brent Backley) and owners of other online poker rooms for violation of these and other federal statutes.

23.     At the same time, Excapsa Services Inc has suffered no harm, either due to the nature of its operations (often conducted through various and sundry foreign subsidiaries) or the cheating that took place while it owned and operated UltimateBet. Instead, since 2006, when it "sold" UltimateBet (via the sale of various operating subsidiaries) to Tokwiro Enterprises in what appears to be a related-party transaction, Excapsa has been involved in liquidation proceedings in Toranto, Canada.  As part of these proceedings, the assets (mainly cash from operations and from the sale) are being disbursed in an orderly manner to Excapsa's shareholders, which include individuals who knew of and participated in the high stakes poker cheating.

24.     However, plaintiffs do not bring this case because defendants did or continue operate an illegal gambling enterprise—they bring this case because they were personally cheated in "fixed" poker games run at UltimateBet.com.  Owners, operators, and employees of Excapsa, the entity that ultimately profited from UltimateBet's operation, both knew about and personally participated in such cheating.  However, before turning to the specifics of the cheating scheme, it will be helpful to provide additional background on online poker.

---

4  Pokerscout.com, data from August 20, 2009.

ONLINE POKER

25.     While a variety of poker games are played online, the most popular is no-limit Texas hold'em .  A typical UltimateBet Texas hold'em table can be seen in **Figure 1**.  Texas hold'em usually involves a table with 9 or 10 players (though shorthanded games are also common).  Each player is first dealt two cards face down. These are the players' "hole" cards and are not shown to anyone else unless and until two or more players reach "showdown."



**Figure 1.  Ultimatebet.com Texas Hold'em Table.**

26.     Initially, each player looks at their cards and a round of betting ensues, beginning with the player to the left of the big blind.[5]  Players can then either "bet," "raise," or "fold" depending on how strong they feel their cards are.  For example, in a game where the big blind is $2, the first player may opt to fold, the second player may

5  Like many poker games, Texas hold'em uses a "big blind" and a "small blind" (typically one-half of the big blind) to induce the action.  These are forced bets that rotate clockwise around the table with each new hand.  For example, in a $1-$2 game, the action starts with a big blind of $2 and a small blind of $1.  If there are no other bets from other players and the small blind wishes to see a flop, he or she is required to put an additional $1 in the pot to "call" the big blind.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

7

decide to call the $2 blind, and the third player may raise to $6.  If the other players all fold, the action returns to second player, who can call the additional $4, fold, or raise to an amount greater than $6.  After everyone who remains in the hand has contributed an equal amount to the pot, the "flop" is dealt.

27.     In Texas hold'em the "flop" consists of three community cards dealt face up in the center of the table.  Each player still in the hand shares these three community cards and, at this point, each player has a five card hand composed of their two secret hole cards and the three community cards.  Another round of checking/ betting/ raising/ folding then follows.  If more than one player remains in the hand after the round of betting, the fourth card, the "turn," is dealt.

28.     The "turn" is another community card dealt face-up next to the three "flop" cards.  Each player now has six cards out of which to make their hand, and the goal is to have the best five card hand.[6]  Another round of checking/betting/raising/folding occurs, and if more than one player remains, the fifth community card, the "river," is dealt.

29.     The "river" is the final community card.  After the "river" is dealt, another round of checking/betting/raising/folding ensues.  When the last bet is called, the players turn their hole cards face-up and the player who has the best five-card hand comprised of the two hole cards and the five community cards wins the pot.  Each player can use one or both or neither of his hole cards to make the best five card hand.[7]  If at any point during the betting rounds described above only one person remains because the others have folded, then that person wins the pot.

30.     The feature that distinguishes no-limit hold'em from limit hold'em, another popular form of poker, is that in no-limit games a player may bet any amount of his chips at any time it is his turn to bet.  In limit hold'em, bets are typically limited to a maximum of double the big blind.  So, for example, in a high stakes limit game where the small and

6  In order of strength, the possible five card poker hands are:  Royal Flush, Straight Flush, Four of a Kind, Full House, Flush, Straight, Three of a Kind, Two Pair, Pair, and High Card.
7  For example, if the five community cards made a royal flush, then neither of the players' hole cards would play and the pot would be evenly split.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

8

big blinds are $300 and $600 respectively, the maximum bet a player can make after the "turn," the fourth community card, is dealt is typically $1200.  UltimateBet offers both high stakes limit and no-limit poker games, and plaintiffs participated in both games according to their preference.[8]

31.   Texas Hold'em is widely considered to be a game of skill, where knowledgeable and disciplined players who practice proper bankroll management will profit in the long run.[9]  Plaintiffs are highly skilled players.

UNCOVERING THE CHEATING

32.   Because online poker operates over the internet, many players and fans are adept computer users.  Further, because players are already online, thousands of web sites devoted to poker education, strategy, and news have sprung up.

33.   One of the most well-known poker news and information site is twoplustwo.com, the website of Two Plus Two Publishing, a respected publisher of educational poker books.  Twoplustwo.com provides over 200,000 registered users access to over 70 different poker-related forums, where any and all aspects of poker are discussed, including probability theory, poker-related legislation, tournament poker, home poker games, and strategy for numerous different varieties of poker.  Because of its influence, it is common for well-known players, executives, or personnel from online poker sites to make or respond to posts at twoplustwo.com.[10]  If the diffuse world of online poker has a central meeting place, it is twoplustwo.com.

---

8 Some plaintiffs also played other poker games such as Omaha and Omaha Hi-Lo at UltimateBet. While it is believed that cheating also took place in these games at UltimateBet, it is unnecessary to elaborate on their specific rules at this time.

9 *See, e.g.,* DeDonno, Michael A. and Detterman, Douglas K., "Poker is a Skill," 12 GAMING L. REV. 31-36 (2008); Fiedler, Ingo C. and Rock, Jan-Philipp, "Quantifying Skill in Games—Theory and Empirical Evidence from Poker," 13 GAMING L. REV. 50 (2009); Dreef, Peter Borm & Ben van der Genugten, "On Strategy and Relative Skill in Poker," 5 INT'L GAME THEORY REV. 83-103 (2003); Noga Alon, Poker, Chance and Skill, (Tel Aviv University, working paper), available at www.math.tau.ac.il/~nogaa/PDFS/skill4.pdf; Croson, Rachel, Fishman, Peter, and Pope, Devin G., Poker Superstars: Skill or Luck? 21 CHANCE 4 (2008), available at opim.wharton.upenn.edu/~dpope/files/Final_CHANCE.pdf.

10 UltimateBet has issued at least one press release related to this case via the twoplustwo.com forums.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

9

34. The popularity of twoplustwo.com is particularly relevant because the cheating that precipitated the instant action was not uncovered by a government or other regulatory authority but by players via the forums at twoplustwo.com. To understand the nature of the cheating, it is useful to summarize how it was discovered.

35. On January 8, 2008, a high-stakes poker player with the twoplustwo.com username Omniheart posted about suspicious play on UltimateBet. Specifically, Omniheart described various unusual hands he had played against a player with the UltimateBet screen name "Nionio" along with information concerning Nionio's unusually high profits.[11] Omniheart requested that other high-stakes players at UltimateBet share their own hand histories and statistics on Nionio so it could be determined whether they were also suspicious.

36. In response to Omniheart's post, high-stakes players dlpnyc21 and trambopoline offered the following observations:

> To be clear, trambo and I believe we were victims of a superuser who could see our cards. Others believe there was highly suspicious play/winrate/stats from Nionio on ub [UltimateBet] from the period of july-september. We have around 3k hands during which time nionio was up 300k. This alone would be a massive heater for anyone at 25/50 [no-limit hold'em with a $25 small blind and $50 big blind] and 50/100 but what's more surprising is that he played another 5k hands (which we do not have right now but know he played based on mypokerintel) at THE SAME WIN RATE. This means that potentially he took over 700k out of the games. He brutalized all the best and winngest [sic] players on the site. If you want more hand histories, email omniheart or myself or trambopoline. The most damaging evidence so far is the HU [heads-up or one-on-one] session vs. trambo, where he plays "perfectly" (in the worlds of trambo), floating/raising every time trambo tried to bluff/folding when trambo had good hands.

---

11 For every hand of poker at UltimateBet and other online poker sites, a unique hand history file is created, which records the players, amount of money wagered, the action in the hand, and the result of the hand. Many serious online players use well-known programs like Poker Tracker or Hold'em Manager to automatically download hand histories for every hand dealt while at the table. This allows a player to keep an accurate record of overall profits or losses as well profits or losses vs other specific players. The programs also record how often other players voluntarily put money in the pot and how often they raise, which gives an indication how loose or aggressive they are. Finally, hand histories allow a player to study hands after a session and to closely examine the play of their opponents.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

10

He is up massively v. myself, trambo, arbian night, whee, cts, basically any respected 2p2er [member of the twoplustwo.com forums] he destroyed. For a LOT of $.

37.      Other high stakes players, including various plaintiffs in this action, responded to these posts with additional information and evidence concerning Nionio's unusual play at UltimateBet.  On January 9, 2008, twoplustwo.com member Josem (Michael Josem), an Australian computer scientist employed as an online poker security specialist, made the following post and scatter plot concerning Nionio's winnings:

A new picture for you to look at [arrow added]:



The point in the upper-right corner is the UB alleged cheater [Nionio].

Some facts about the graph:
          -There are 870 "normal" players from a variety of sites and limits
          -Each of those other players have at least 2,500 hands logged on them.
          -The graph is in big blinds/100 [hands], not PokerTracker's big bets/100.
          -The mean bb/100 win rate is 1.528 bb/100
          -The standard deviation is 14.08 bb/100

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

11

-The alleged UB cheater is winning at around 10 standard deviations above the mean

-The confessed AP cheater [from the Absolute Poker cheating scandal] was winning at around 15 standard deviations above the mean.

I think that 10 standard deviations is something in the order of winning a 1-in-a-million lottery three or four times consecutively - although I'd prefer if a maths expert could be a little more clear.

38.     During the following weeks, members of twoplustwo.com identified additional accounts on UltimateBet that showed highly abnormal win rates, particularly given how extremely loose and aggressive the players were (characteristics generally indicative of losing poker play).  Players began to contact UltimetBet and the high-profile professional poker players who served as spokespersons for the site (such as Phil Hellmuth and Annie Duke) demanding a response to the cheating allegations.

39.     On February 3, 2008, in response to the firestorm brewing in the online poker community, UltimateBet sent the following email to its players:

On Saturday, January 12, 2008, UltimateBet was notified by customers that a player with the online handle 'NioNio', demonstrated an unusually high winning percentage. Upon receiving this notification, UltimateBet immediately launched an internal investigation.

We have also engaged the services of an expert third-party to help us determine whether or not this allegation of suspicious play is accurate and we are in open discussions with our regulatory body, the Kahnawake Gaming Commission (KGC), regarding this investigation.

We want to make it clear that UltimateBet takes all allegations of unfair play very seriously, and we want to extend our strongest possible assurances that we will do our utmost to protect our players and our company from every and any form of cheating. We also recognize the importance of communicating timely and accurate information regarding this incident to our customers as we learn the facts.

Do not hesitate to contact us if you require further assistance or additional information.

Best regards,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12

Sebastian
UltimateBet ~ Customer Support
'The Ultimate Poker Experience'
Support@UltimateBet.Com

40.     In the meantime, players were conducting investigations into several other "unknown" players with suspicious activity and profits.  In addition to their own hand history databases, players made use of websites like mypokerintel.com, which saves data from high stakes games and keeps track of information about player activity and win rates.  Members of the twoplustwo.com forums discovered, among other things, that certain accounts with highly improbable win rates often logged on to UltimateBet right after a similarly suspicious account had logged off.  Also, many of the suspicious players simply disappeared, never to return, after booking huge wins at high-stakes games, an extremely unusual pattern of activity.  Finally, the high-stakes online poker community is relatively small and many high-stakes players know one another from their hundreds of hours of play together, from discussing poker strategy online, and from meeting at live events, such as the annual World Series of Poker in Las Vegas.  However, no one had any information about the real world players behind the suspect UltimateBet accounts.

41.     On March 6, 2008, UltimateBet posted the following press release at twoplustwo.com:

> Montreal, Canada (March 6, 2008) – UltimateBet (UB), one of the ten largest online poker cardrooms, today issued the following interim statement with respect to allegations of unfair play on its site.
>
> On January 12, 2008, UltimateBet was alerted to allegations that a player with the online handle "NioNio" exhibited abnormally high winning statistics and was accused of having an unfair advantage during play.
>
> These allegations were made both directly to UltimateBet by concerned players and the KGC [Kahnawake Gaming Commission], and indirectly through several web forums. The allegations also included reports of suspicious activity concerning the deletion of the NioNio account and other accounts that may have been related to this scheme.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13

We immediately launched an extensive inquiry involving an independent third-party expert to review hundreds of thousands of hand histories, all of which were promptly locked down and made available to this expert. The initial findings of our third-party expert confirm that the NioNio account's winning statistics were indeed abnormal, and we have expanded the investigation to look into whether an unfair advantage existed, how such a scheme might have been perpetrated, and whether additional accounts beyond those of NioNio were involved.

UltimateBet is in regular communications and contact with its regulatory authority, The Kahnawake Gaming Commission (KGC), and will continue to cooperate fully with that body. UltimateBet is determined to complete a full and thorough investigation. We pride ourselves on providing a safe, secure playing environment for our customers. The investigation has proven to be extremely complex and, therefore, has been more extensive and taken much longer than initially expected. We continue to aggressively pursue the matter and will communicate the findings of our full investigation to our regulatory authority and to our customer base as soon as practicable.

42.    The above press release mentions the Kahnawake Gaming Commission (KGC), which is discussed at length in the 60 Minutes piece focused on this and a related cheating scandal that took place at UltimateBet's sister site Absolute Poker. UltimateBet and Absolute Poker are now operated by the same holding company, Tokwiro Enterprises, allegedly a Mohawk sole proprietorship owned by the Joseph Norton, the former Grand Chief of the Kahnawake Tribe, which operates the KGC. According to 60 Minutes:

The virtual poker games are actually run on computers servers from a Canadian Indian reservation outside of Montréal. It's all licensed by the sovereign tribe of the Mohawk nation, which has no experience in casino gambling and doesn't have to answer to Canadian authorities.
The [current] grand chief is Mike Delisle.
Chief Delisle says Internet gambling is illegal in Canada, but tells Kroft, "We're not Canadians. We're a member of the Haudenosaunee Five Nation Confederacy. And we're Mohawk Kahnawake people. We're not Canadian."
And that legal distinction has allowed the Kahnawakes to rake in millions of dollars a year by licensing Internet gaming sites and housing their computer servers on the reservation. They now register and service

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

more than 60 percent of the world's Internet gaming activity from a highly protected and non-descript building that used to be a mattress factory.[12]

43.    KGC, the regulatory body to which UltimateBet claims to answer, is part of a self-proclaimed sovereign entity located on a few square miles just across the St. Lawrence River from metropolitan Montreal.  The Canadian government has had a history of tense, even violent, relations with the Kahnawake Tribe, who are notorious for cigarette and gun smuggling.[13]  The Canadian Government considers the licensing and regulatory activities of the KGC to be illegal.[14]

44.    By March 2008, it appeared that several million dollars had been stolen in high stakes poker games in which certain opponents had access to players' hole cards. On March 20, 2008, twoplustwo.com user Cornell Fiji (Steven Ware) made a post entitled "Superusers and Silence: How UltimateBet let players get cheated for millions," summarizing the state of the investigation as follows:

> It has been one hundred fifty days [sic] since allegations about suspicious activity in the high stakes no limit games on UltimateBet were first made public in this thread in the High Stakes No Limit forum (referred to as 'HSNL' from this point) on twoplustwo.com.
>
> Several million dollars were stolen and the evidence in the HSNL thread indicates very strongly that:
>
> •    UltimateBet has known about the cheating for at least nine months.

12  Transcript of 60 Minutes segment, "Poker Face," at 3, available at www.cbsnews.com/stories/2008/11/25/60minutes/main4633254_page3.shtml?tag=contentMain;contentBody.
13  See, e.g, Marsden, William, "Mohaws, Gangs, and Tobacco," Montreal Gazette, April 28, 2009, available at www.montrealgazette.com/news/Mohawks+gangs+tobacco/1437136/story.html; "Native Leader Warns of Confrontations Over Tobacco Strategy," Ottawa Citizen, May 7, 2008, available at www.canada.com/topics/news/national/story.html?id=ab40f4b2-b3fe-412f-a90c-f2db90d4d16a; Garcia, Guy D., "Canada: The Army Breaks the Barriers," TIME, September 10, 1990, available at www.time.com/time/magazine/article/0,9171,971078,00.html.
14  See, e.g., Hansen, Burke, "Quebec Fights Mohawk Nation Over Online Gambling Jurisdiction," The Register, December 1, 2007, available at www.theregister.co.uk/2007/12/01/golden_palace_plea_deal/; "Canadian Government Targets Kahnawake Online Gambling Sites," The Online Gambling Insider, March 9, 2008, available at www.online-gambling-insider.com/online-gambling/ogi-canadian-goverment-targets-kahnawake-online-gambling-sites-03-09-08.html ("The Canadian federal government is reported to be targeting what it sees as illegal gambling sites in the Kahnawake reserve near Montreal. Online gambling is supposedly not legal in Canada, but the Mohawks of Kahnawake claim that their sovereignty excludes them from any Canadian laws.")

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

• UltimateBet knew about but did not make any attempt to acknowledge the cheating before it was exposed on 2+2.

• People who worked for UltimateBet facilitated the cheating.

• UltimateBet actively took steps to cover up these crimes and thwart the investigation of this scandal.

Additionally:

• UltimateBet did not make any public statements or acknowledge that cheating had occurred until March 6th, 2008, three full months after the crimes became public.

• UltimateBet has not reached out to any of the players who were stolen from (many of whom still don't know that they were cheated). When players read the HSNL thread, discover that they have been cheated and attempt to contact UltimateBet, they're forced to wait several days for an email response, only to be told that UltimateBet is 'looking into the allegations.'

• UltimateBet has not offered to reimburse any of the victims of the theft.

....

As many of you know, when you cash out of an online poker site, the cash out must first be cleared through the site's security department. Major withdrawals from new players are examined with additional scrutiny.

It defies reason to believe that a red flag was not raised when a new player began beating the highest stakes games on UltimateBet at a win rate that was ten standard deviations over his expectation. But even if UltimateBet's security department was so incompetent as to not investigate NioNio's account while the cheating was taking place it is virtually impossible that they did not investigate him when he requested to have name changed and cashed out in September 2007.

It is simply unfathomable that red flag [sic] was not raised when NioNio, the most successful Poker player in the history of the world, a guy for whom logging onto UltimateBet was like going to an ATM machine... and stealing the whole thing, abruptly decided a couple days after the Absolute Poker scandal became public that he wanted to close his account. The only rational conclusion is that UltimateBet had full knowledge of the cheating as it was taking place and deliberately allowed it to continue just like at their sister site Absolute Poker where the founder of the company was cheating and orchestrating [a] cover-up.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

16

45.    In response to the evidence that had been marshaled by players and after its own internal "investigation," on May 29, 2009, UltimateBet issued a press release admitting that superusers (players with access to other players' hole cards) had indeed stolen millions of dollars from players at UltimateBet. Among other things, the press release states that:

> Tokwiro Enterprises ENRG ("Tokwiro"), proprietors of UltimateBet.com ("UltimateBet"), one of the world's largest online card rooms, today announced the results of its lengthy investigation into allegations of unfair play, which was triggered by concerns about an account named 'NioNio'.
>
> ...
>
> The investigation has concluded that certain player accounts did in fact have an unfair advantage, and that these accounts targeted the highest limit games on the site. **The individuals responsible were found to have worked for the previous ownership of UltimateBet** [i.e., Excapsa Software, Inc.] prior to the sale of the business to Tokwiro in October 2006.
>
> ...
>
> The fraudulent activity was enabled by unauthorized software code that allowed the perpetrators to obtain hole card information during live play. The existence of this vulnerability was unknown to Tokwiro until February 2008 and existed prior to UltimateBet's acquisition by Tokwiro in October 2006. Our investigation has confirmed that the code was part of a legacy auditing system that was manipulated by the perpetrators.
>
> ...
>
> **Six player accounts are confirmed to have participated in this scheme.** No accounts were deleted at any point, although some account names were changed multiple times. The following account names are known to have been used in the fraudulent activity: NioNio, Sleepless, NoPaddles, nvtease, flatbroke33, ilike2win, UtakeIt2, FlipFlop2, erick456, WhackMe44, RockStarLA, stoned2nite, monizzle, FireNTexas, HeadKase01, LetsPatttty, NYMobser, and WhoWhereWhen.
>
> ...
>
> The refund process will begin immediately. The accounts associated with fraudulent activity did not use an unfair advantage in all play sessions. Regardless, UltimateBet is refunding all losses to these accounts. Accounts related to the fraudulent activity have been disabled, and the individuals associated with those accounts permanently banned from the site.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(Bold added.)  Thus, UltimateBet has admitted that at least six accounts (presumably six separate individuals), some or all of which belonged to employees and/or owners of Excapsa Software, Inc., used a software vulnerability to steal millions of dollars from players on its site.  However, UltimateBet did not then and to this day has not released the names of any individual other than Russ Hamilton, a former World Series of Poker Winner, early manager/employee of UltimateBet, and shareholder of Excapsa, on whom UltimateBet has sought to pin the exclusive blame.

46.     However, given the nature of the security breach (which is essentially built-in to the underlying software) and UltimateBet's willingness to protect the identities of the cheaters, it is likely that the cheaters were high-level members of UltimateBet's management and/or software engineering team, and/or its founders and original programmers, as only such individuals could create and exploit the software loophole, frequently change the names of cheating accounts to avoid suspicion, and bypass security measures designed to prevent the cash out of illegitimate winnings.  Statements from insiders at UltimateBet have corroborated these suspicions.[15]

47.     In its May 29, 2008 press release UltimateBet promised to refund players money that had been stolen from them by the cheaters.  While UltimateBet has provided "refunds" to certain players, it has largely kept its methodology for doing so secret.  Moreover, it has refused to publicly release or even send affected players hand histories from the compromised games, so that they might determine the accuracy of the refunds; it has refused to provide a full account of its investigation, so that players can examine whether the list of fraudulent accounts is complete; it has not addressed the role of cheating accounts in other poker games, such as high-stakes tournaments or high-stakes limit (as opposed to no-limit) games; and it has refused to compensate players for lost interest, lost profits, emotional distress, or any other form of damages.  In short, UltimateBet has acted as its own investigator, judge, and jury in this matter and has

---

[15] See, for example, a Febreuary 2011 podcast (internet radio) interview of Russ Hamilton's former computer technician and assistant, Travis Makar, in which he implicates members of UltimateBet's senior management in the cheating and subsequent cover up.  A transcript of the Makar Interview is attached hereto as Exhibit A.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

18

stifled any public scrutiny of its "investigation." The Makar interview makes it clear that such refunds were given on a largely "ad hoc" basis and that hand histories were intentionally altered or destroyed. Makar Interview, Exhibit A at 6, 16. Cheated players are bringing this action because they believe that only a public and impartial tribunal can accurately determine the full scope of the cheating and the identities of the individuals behind it.

48.     Despite the assurances in UltimateBet's May 29 press release, players are concerned about the integrity of its "investigation" and the lack of information provided to those affected by the cheating. In early June 2008, well-known twoplustwo.com user trambopoline posted that he had been in contact with UltimateBet and had sent them a list of nine additional suspicious accounts. He was informed that some of the accounts were indeed likely cheaters and that the investigation was continuing.

49.     Then, on June 28, 2008, "brainwasdodo," a newly registered member of twoplustwo.com with no prior posts, made the following statement:

To whom it may concern,

I came to post today with the claim of no less than the so called "nionio" was manufactured by the current management of the company.

Tomorrow or the day after, you will receive an extensive report from both KGC and UB/AP, on how the company was the victim the wrongdoing of the previous management, very similar to Annie's [Annie Duke, a sponsored UB professional poker player] statements.

I only wanted to come out now, just to say a few words before these new founding's [sic] and the additional refund process begins. **Also to give you a hint how the company "found" the "additional accounts and data surrounding the unfair play". I helped them.** My posts will soon to follow these upcoming statements, please stand by, and I see you guys in a few days.

I am sorry to post this message all over the forum, but the last time I have posted here, my message survived about 10 minutes. Here I would like to ask the editors of 2+2, to please kindly make my future posts available to this forum.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

19

Thanks.

(Bold added).  As discussed below, in subsequent communications it became clear that "brainwashdodo" was indeed an insider at UltimateBet with intimate knowledge of illicit activity taking place at the site.  Among other things, he posted administrative logs of UltimateBet transaction histories amounting to millions of dollars, including some between suspicious accounts and well-known professional players who are believed to have stakes in the company.

50.      On July 8, 2008, UltimateBet issued another press release stating that additional cheater usernames had been uncovered and that, "We have also confirmed that the cheating dates back further then we initially believed.  We can now confirm that the cheating began in January 2005."[16]

51.      One the same day, brainwashdodo made two more posts at twoplustwo.com with screenshots of administrative logs (only accessible to UB personnel) for various accounts at UltimateBet.  The logs include that of Phil Hellmuth, one of the world's most famous poker players and the primary celebrity spokesperson (and part owner) of UltimateBet and related entities.

52.      Among other things, the logs posted by brainwashdodo show nearly three million dollars of transfers between April 1, 2006 and May 20, 2007, to and from an UltimateBet account named "-Fred-."  Sources have stated that the -Fred- account was owned by Fred David, one of the founders of UltimateBet.  During the time in question, the -Fred- account played only three single-table sessions on two different days.  The -Fred- account appears mainly to have been used to move large amounts of money between numerous individuals.  On September 3, 2006, -Fred- transferred $10,000 to ShaqTack, a known cheating account.

53.      Many of the transfers to and from the -Fred- account were with Russell Hamilton or "russh."  Russ Hamilton won the 1994 World Series of Poker, was intimately involved with the founding of UltimateBet, and is or was a shareholder of the

---

16 July 8, 2008 press release, available at www.ultimatebet.com/poker-news/2008/july/Investigation-Status-Update.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

closely held Excapsa Software, Inc. He is discussed at length in the 60 Minutes television piece. Players discovered that the address listed for the cheating account that was operated at different times under the names "nvtease," "sleepless" and "NoPaddles" was for a property in Nevada owned by Mr. Hamilton.

54.   Mr. Hamilton was the only individual implicated by name in the "final" report issued by the KGC on the scandal. However, on information and belief, Mr. Hamilton has no computer programming experience and could not have perpetrated the fraud without technical and administrative assistance of other individuals associated with defendants.

55.   The name listed for the UltimateBet account that operated at various times under the names "nvtease," "sleepless," and "NoPaddles" is Lauren Merker. On information and belief, Lauren Markar is related to and owned property in Las Vegas with Travis Makar, a computer specialist who worked with UltimateBet and was friends with Russ Hamilton.

56.   The administrative screenshots posted by brainwashdodo also showed hundreds of thousands of dollars being moved between the -Fred- account and accounts owned by Phil Hellmouth, Freddy Deeb (a well-known poker player with the UltimateBet account name "Kid55," which was closed a day prior to the cheating ShaqTack account was closed), Lyle Berman (a well-known poker player and casino developer), and Russ Hamilton. UltimateBet has never made a public statement concerning these figures, their role in the scandal, nor their suspicious activities.

57.   On July 25, 2008, UltimateBet issued a press release announcing the conclusion of its investigation into the cheating.[17] The release states that:

> Tokwiro [owner of UltimateBet] has compiled complete forensic evidence including the IP addresses, devices, transfer and withdrawal histories, and names associated with the player accounts that benefited from illicitly viewing hole card information. The results of Tokwiro's internal investigation have been turned over to the Kahnawake Gaming Commission (KGC) and its auditors, as that regulatory body continues its

---

17 Available at www.ultimatebet.com/poker-news/2008/july/Tokwiro-Concludes-Its-Investigation-Into-Unfair-Play-On-Ultimatebet-Site.

independent investigation.  These results are in addition to the data which Tokwiro has already shared with the KGC.

**Tokwiro has identified a total of 19 accounts and 88 associated usernames that were involved in the cheating, including the accounts that were named in Tokwiro's publicly posted investigation updates of May 29, 2008 and July 8, 2008.  The same perpetrators that were previously identified controlled all of these usernames.** There are no new perpetrators involved, only new usernames.  Usernames were changed many times over the course of the cheating scam in an apparent scheme to avoid detection.  Our complete list of usernames involved in the cheating scheme has now been turned over to the KGC, and the Company does not expect to uncover any additional usernames.

....

The investigation revealed that the perpetrators logged into the client software, using an account that had the ability to view hole cards.  The ability of a specific account to view hole cards was enabled by illicit software that was placed on the UltimateBet servers prior to October 2006, which was before Tokwiro acquired the business.

(Bold Added).  Thus, UltimateBet has basically admitted the truth of the information uncovered by the players' investigation.  However, it has nonetheless refused to release a complete list of the cheating accounts and has also not released the actual name of any perpetrator.  Instead, it turned over the information from its investigation to its "regulator."  In his interview Mr. Makakar notes, "In the recordings [of a meeting of UltimateBet executives], they sit there and they laugh about how the Kahnawake tribe is doing this and how they turned it over to the authorities.  Well, the authorities were they turned it over to one of the family members whose one of the, like, police officers on the tribe or something.  You know, it's just all show.  It's all show." Makar Interview, Exhibit A at 26.

58.    On September 29, 2008, the KGC, the "regulator" of UltimateBet and hundreds of other online gambling sites, issued a short two page "report" on the cheating scandal stating that:

The Commission found clear and convincing evidence to support the conclusion that between the approximate dates of May 2004 to January 2008, Russell Hamilton, an individual associated with Ultimate Bet's

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

22

affiliate program, was the main person responsible for and benefiting from the multiple cheating incidents. Furthermore, the KGC is currently in contact with the appropriate law enforcement agencies and intends to fully cooperate in the prosecution of all individuals involved in the UB cheating incidents.

59.    The KGC's made another communication concerning this matter on December 1, 2008 in a press release responding to the 60 Minutes segment.  In that statement the KCG claims that all players affected by the cheating have been refunded.  The KGC also states that it has made a criminal complaint against Russ Hamilton, though it does not identify the authorities to which it has complained.

60.    Finally, on September 11, 2009, the KGC issued a "final" report on the UB cheating scandal.   Among other things, the September 11 Report states that:

1.  Between June 2003 and December 2007, cheating occurred on the UB site whereby players' rights to a fair and honest game were violated;

2.  The cheating was initiated by one or more individuals associated with UB prior to Tokwiro having acquired an ownership interest in UB;

....

4.  The cheating resulted from certain individuals manipulating the software then being used by UB's prior ownership and said manipulation was possible due to deficiencies in the control systems that were created, implemented and/or used by UB's prior ownership;

The report also identifies 117 usernames associated with 23 separate UB accounts used by the cheaters.  However, as with prior KGC "reports," despite noting the use of 23 different accounts, the only individual identified by name is Russ Hamilton.

61.    The players have no reason to trust either UltimateBet's or the KGC's statements about or investigation into the scandal.  UltimateBet has largely produced information only after it was uncovered by players.  Further, many lines of evidence point to a significant cover-up within the company.  See generally, Makar Interview, Exhibit A.  Because of the legal issues involved with operating an online gambling site, much less a fraudulent one, it is clearly in UltimateBet's interest to withhold as much information as possible.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

23

62.     Additionally, the KGC is not recognized by Canada, the United States, or any legitimate state, provincial, or local authority, and it has massive conflicts of interest in the case, particularly now that its former chief and the originator of its plan to enter into online gambling "regulation" owns UltimateBet and has no interest in seeing the company injured.  Finally, even if the KGC did not have massive conflicts of interest, it has limited competency and insufficient resources to serve as a true regulator (as opposed to a quasi-jurisdictional no man's land where gambling operations can rent server space in exchange for protection from scrutiny).

63.     Under federal and state law, the affected players have a right to learn the truth of who cheated them, how they were cheated, and to receive appropriate redress for their injuries.  UltimateBet should not be allowed to control the investigation into its fraudulent activities and to set the terms of any penalty unilaterally.

## THE TANGLED WEB OF ULTIMATEBET'S OWNERSHIP

64.     Many of the details of UltimateBet's history, ownership, and control have been obscured by an intentional scheme designed to protect its owners and investors from legal scrutiny in the United States and elsewhere.  Much of what follows has been uncovered by player investigation and through examination of documents associated with the liquidation of the holder company that owned and operated UltimateBet, Excapsa Software, Inc. (now know as 6356095 Canada, Inc. for liquidation purposes).  The only way that cheated individuals will learn the full details of the conspiracy and those who benefited from it will be through this action.

65.     According to a report on the history of online poker, UltimateBet made its debut at the end of 2000 and was set up jointly by the software firm ieLogic (founded by techies Greg Pierson and Jon Karl and now known as Iovation) and some secretive high stakes poker players.[18]  Russ Hamilton was a "consultant" and likely part owner in the early stages.  One of the first noteworthy moves they made was recruiting Phil Hellmuth as a player spokesperson for the site.

---

18 "History of Online Poker," Total Gambler, available at
   www.totalgambler.com/pokerlife/pokerfeatures/4602/poker_timeline.html.

66.     On information and belief, a separate entity, eWorld Holdings, LTD., was founded to run the UltimateBet.com website and to license the software from ieLogic. Even though ieLogic would be the primary beneficiary of profits made by UltimateBet through a royalty-based licensing model, the creation of a separate entity to run the website would provide the de facto owners of UltimateBet an additional layer of protection from public or official scrutiny.

67.     According to MSNBC, "IeLogic never acknowledged any ownership interest in UltimateBet, saying only that it licensed its 'multiplayer online games' software to the site. Then the company sought to disassociate itself from the internet gambling business entirely by selling its gambling software to a newly incorporated Canadian company, Excapsa Software, Inc., in the spring of 2004."

68.     The heads of ieLogic, Pierson and Karl, retained part of ieLogic's business devoted to internet security and fraud protection when Excapsa was formed. They named the new company Iovation and, on information and belief, maintained a significant ownership interest in Excapsa.

69.     In February 2006, Excapsa went public on the Alternative Investment Market of the London Stock Exchange, raising £56.2 million pounds. The corporate structure of Excapsa is explained on page 7 of a "2005 Results Presentation" delivered in March 2006.[19] There it is shown that Excapsa is the controlling entity of a second company, Game Theory Holdings, which "Owns the I.P." and "Licenses Software" to various poker site "skins," including ultimatebet.com (which generated 97% of the revenue), which is itself operated by eWorld Holdings.[20]

---

19 2005 Excapsa Results Presentation, attached hereto as Exhibit B.
20 In actuality, Excapsa's corporate structure is even more complex than suggested by the May 2006 Presentation. In an affidavit to the Canadian Liquidation Court, Daniel Friedberg, former Secretary of Excapsa Software, Inc., states the following: "Since February 9, 2006, Excapsa has only been a holding company. Its business operations were, at relevant times, carried on by the following direct and indirect subsidiaries (the "subsidiaries"):
(a) Excapsa Services, Inc., an Ontario Corporation
(b) Game Theory Ltd., a Malta Corporation
(c) Game Theory Holdings Ltd., a Malta Corporation; and
(d) Game Theory Services, Ltd., a Malta Corporation."
Affidavit of Daniel Friedberg at 1-2, attached hereto as Exhibit C.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

25

70.     On information and belief, Excapsa, Game Theory, eWorld Holdings, and UltimateBet effectively operated as a single entity and to the extent they maintained any separate and distinct identity, they did so for improper purposes.  Their status as "separate" entities should be disregarded by this Court and their liability should be treated as joint and several.  Such unity of identity continued after the purchase by Blast-Off, Ltd.  Additionally, because the companies were formed, structured, and operated to perpetrate an illegal and fraudulent scheme on the public, their corporate status should be disregarded with respect to their founders, managers, owners, and agents.

71.     Toward the end of 2006, it was becoming clear that President Bush would sign the Unlawful Internet Gaming Enforcement Act (UIGEA).[21]  This would place additional pressure on online gambling sites serving US customers.  Therefore, on October 12, 2006, the day before the Act was signed into law, Excapsa sold all the shares it held in its various operating subsidiaries to Blast-Off Limited, a Malta Corporation, for an aggregate purchase price of US$130,000,000.[22]

72.     Blast-Off Limited, the buyer of UltimateBet and the subsidiaries of Excapsa, is a wholly-owned subsidiary of Tokwiro Enterprises, which is solely owned by Joesph Tokwiro Norton, the former Grand Chief of the Kahnawake.

73.     The terms of the sale were that Blast-Off would make an initial $10 million payment to Excapsa and issue a $120 million promissory note for the remaining balance, to be paid in monthly installments out of operating income until May 31, 2012.[23]  The structure of the deal would thus permit shareholders of Excapsa to effectively realize revenue from the ongoing operation of UltimateBet for five and a half years beyond the date of sale, while presumably avoiding enforcement actions by US authorities.  According to an October 13, 2006, article in the *Times of London*, "Legal sources immediately claimed that the deal, a response to the impending US ban on internet

21 Holahan, Catherine, "Online Gambling Still in the Cards?," MSNBC.com, October 4, 2006, available at www.msnbc.msn.com/id/15118962/.
22 Friedberg Affidavit, Exh. C at 3.
23 *Id*. at 3-4.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

gambling, was almost certainly illegal because $120 million of the price will be deferred until after the law [UIGEA] takes effect today."[24]

74.    After the sale, Excapsa Software, Inc., the former holding company of various entities that provided software for and operated UltimateBet, had no further business to conduct and held assets amounting to approximately $50 million cash and $120 million due under the promissory note from Blast-Off.[25]  Thus, on November 22, 2006 it filed a petition in Canadian court for voluntary dissolution and distribution to its shareholders.[26]  As part of the proceeding, in which a solvent corporation is wound down and its assets disbursed, Excapsa Software, Inc. was renamed 6356095 Canada, Inc. and placed under the control of liquidators representing the interests of shareholders.  In its application for dissolution, Excapsa notes that, "[s]ince the Note provides for payments up to and including May 31, 2012, the affairs of Excapsa will not be finalized for more than five and one-half years (assuming that the buyer does not make pre-payments under the Note)."[27]

## EXCAPSA'S SETTLEMENT WITH BLAST-OFF

75.    By all appearances, the liquidation of Excapsa was proceeding as expected until the cheating scandal was uncovered.  Then, on August 23, 2008, counsel for Blast-Off Limited (BOL) and Joesph Tokwiro Norton sent a letter to Excapsa demanding, among other things, US $81,400,000 "on account of the damages sustained by BOL and by Mr. Norton as a result of Excapsa's conduct."  According to the letter:

> It has come to light that certain individuals were cheating by seeing other players' "hole cards" during live internet poker games using the Code, to the obvious detriment of these innocent players.  Based upon its recently completed investigation into this conduct, BOL has concluded that this cheating was possible as a result of a tool hidden in the Code (the "tool").
>
> **Excapsa had knowledge of the Tool and did not disclose its existence to BOL.  Furthermore, Excapsa also had knowledge of the**

---

24  "Deferred portion of £130m Excapsa sale raises questions," *Times of London*, October 13, 2006, available at business.timesonline.co.uk/tol/business/markets/united_states/article599964.ece.
25  Application for Dissolution at 9.
26  *Id.*
27  *Id.* at 8.

**illegitimate use of the Tool and made a number of related material misrepresentations to BOL during the negotiation and implementation of the Stock Purchase Agreement.**

(Bold Added).  According to the letter, **players experienced direct losses in the amount of $19.5 million as a result of the cheating**.

76.     The dispute between Blast-Off and Excapsa never resulted in formal litigation, as the companies had strong incentives to settle the dispute privately. However, because Excapsa was and is involved in liquidation proceedings in Canada, any litigation settlement had to be approved by the court as well as Excapsa's shareholders and thus much of the relevant information is public.[28]

77.     On October 20, 2008, XMT Liquidators, Inc., the firm overseeing the liquidation of Excapsa (aka 6356095 Canada, Inc.), sent a letter to Excapsa's shareholders recommending that an Amendment to the original Blast-Off Purchase Agreement be agreed to in order to settle Blast-Off's claims, because, among other things, "defending the Buyer's [i.e., Blast-Off's] claim may also leave the Company [Excapsa] directly exposed to claims from players who suffered losses as a result of the unfair play between May 2004 and the date of the sale transaction, being October 2006."[29]  The letter notes that Blast-Off had refunded $US 6,141,908.65 as of the date of the letter and that, "[t]he liquidator has seen internal documents of the Buyer [Blast-Off] indicating that payments to other accounts of customers/poker players who were victims of unfair play will aggregate no less than an additional US $9 million."[30]

78.     Among other things, the Amendment requires that: 1) Excapsa pay Blast-Off $14,625,000 to cover reimbursement of cheated players, 2) that Blast-Off cause delivery of approximately 6,900,000 shares of Excapsa stock for cancellation,[31] 3) that Blast-Off cause delivery of not less than 49,300,000 of Excapsa shares as collateral security for the payment of the next US$10,250,000 Blast-Off owed to Excapsa under the

---

28 Documents related to the liquidation proceedings can be viewed at
     www.wsbg.com/en/liquidation.html.
29  Approval of Execution and Adoption of Amendment to Sale Documents at 7.
30  *Id*. at 8.
31 Of these shares, approximately 4,000,000 are believed to have been owned by Russ Hamilton.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Promissory Note, 4) that Blast-Off provide additional security under the Promissory Notes in the form of shares of Game Theory Holdings and the ultimatebet.com domain name, and 5) a full release of Blast-Off's claim.

79.     As indicated, XMT Liquidators urged shareholders to approve the Amendment to the Purchase Agreement in order to quietly settle Blast-Off's claims. (Two-thirds of the outstanding shares of Excapsa were required for the Amendment to be passed.)

80.     However, at least one significant shareholder raised concerns about the settlement. On October 13, 2008, Peter Collery, President of SC Fundamental, a New York investment firm controlling approximately 7 million shares of Excapsa, wrote to the liquidators stating that even if the consent of two-thirds of the shares is obtained, "[w]e have concerns that either (i) the consent is not truly informed; or (ii) some or all of the consenting shareholders and the persons soliciting their consents may have self-serving interests which are not shared by the balance of the Company's owners."

81.     In particular, Mr. Collery's raised concerns that:

> It seems difficult to understand why [shareholders of Excapsa] would [approve the settlement] unless they have some interest in the fortunes of BO [Blast-Off]. This impression is not lessened by the fact that certain shareholders are willing to forfeit their shares to facilitate the deal, and that others are willing to guarantee BO's performance under its note to the Company. Who are these shareholders? What common interest do they have with BO?

82.     While SC Fundamental did not press its concerns and the settlement was ultimately agreed to by shareholders, the questions it raises are serious. Why would shareholders of Excapsa pledge 49,300,000 shares as security for Blast-Off's debt? Why would certain shareholders agree to cancel 6,900,000 of their shares? Clearly, whether through ownership or otherwise, some of the shareholders of Excapsa are deriving significant benefit from the continued operation of Blast-Off, perhaps in the form of "consulting" or "promotional" fees agreed to in connection with the under-capitalized sale of Excapsa's various assets to Blast-Off.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

83.     Regardless, it appears that certain individuals owning a significant portion of the outstanding shares of Excapsa, individuals who may have been involved in or befitted from the cheating of players, are still deriving substantial benefit from the operation of UltimateBet.  This despite the fact that Blast-Off is allegedly a wholly-owned subsidiary of Tokwiro, which is allegedly wholly owned by Chief Joseph Norton. Additionally, as a condition of settlement, Blast-Off required that its financial records be kept entirely confidential, presumably to shield the identity of such individuals.

84.     These suspicions gain additional support from the fact that the corporate name "Blast-Off" did not first appear on the scene when it purchased Excapsa's holdings just before the passage of the UIGEA.  In fact, Mansour Matloubi, another former World Series of Poker winner and associate of Russ Hamilton, who was also involved in the creation of UltimateBet and who owns 3,846,256 shares in Excapsa, registered the internet domain name "BETT21.NET" in September 2005.[32]  As the "Administrative Contact" for the registration, Mr. Matloubi lists  BlastOff LTD, 99/16 Moo 20 Perfect Place, Ramhamhaeng 164, Minburi, Bangkok 10510, TH, 555-555-5555.  On information and belief, Mr. Matloubi is a British citizen who resides in Thailand.  Thus, a year prior to the rushed sale of Excapsa's assets to Joseph Norton's Blast-Off, Ltd, another company named "Blast-Off, Ltd" controlled by one of Russ Hamilton's closest associates registered the domain name for another gambling-related site.

85.     This and the information presented above, along with the secretive nature of the settlement between Blast-Off and Excapsa, strongly suggests that the cheating that occurred at UltimateBet was not the result of some rogue individual but that it happened with the knowledge, direction, and participation of persons at the very core of Excapsa and its related entities.  Players have been asked to trust UltimateBet and to believe that everything has been made right, even though the perpetrators of the conspiracy other than Russ Hamilton have never even been identified.  Plaintiff's bring this action, among other

---

[32] Mr. Hamilton has been involved with numerous black-jack related ventures, including the "Ultimate Blackjack Tour."

things, to vindicate their right to discover how they were cheated and by whom, and to receive compensation for their injuries.

86.     The liquidation court had to approve any settlement amending the Purchase Agreement between Excapsa and Blast-Off. On October 14, 2008, the court conditionally approved the settlement/amendment subject to the liquidators filing papers indicating that all the conditions of the settlement had been met, including a report concerning the amount stolen from players. A redacted version of the Report, by Uri Kozai of RealTime Edge Software, was filed on October 29, 2008. Interestingly, the only information redacted from the Report is the total amount that would be "required to compensate victims of the fraud for their losses."

87.     It is important to note the Mr. Kozai had such significant conflicts of interest that in no sense can the Report be considered an independent appraisal. In the two years prior to founding RealTime Edge Software in 2007, Mr. Kozai was an employee of Excapsa Software, where he led the development team that maintained the software of UltimateBet. Additionally, the Report notes that, "RTE continues to develop and maintain the Ultimatebet software platform." Also, Mr. Kozai owns approximately 1,200,000 shares of stock in Excapsa. Thus, it would have been difficult to find someone who was less independent than Mr. Kozai.

88.     Nevertheless, the Report does have some value, because it is one of the very few sources of information about any methodology used to establish the amount players are owed as a result of the cheating. The Report states that Mr. Kozai had access to the entire database of play on UltimateBet dating back to 2003 and that a copy of the database had been provided to KGC as well. Presumably this key information has been maintained and not destroyed and will be provided to plaintiffs during discovery so they can conduct their own analysis of losses.

89.     Second, the Report assumes that the only cheating accounts were those whose names were provided to Mr. Kozai by UltimateBet. Given that the process of uncovering fraudulent accounts was driven by players, plaintiffs are concerned that all

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

31

the cheating accounts have not yet been identified.  If Mr. Kozai's analysis did not include all cheating accounts, then player losses were necessarily underestimated.  The Report states that the process UltimateBet used to uncover cheating accounts is discussed in Exhibit A of the Report.  However, Exhibit A is missing from the publicly available version of the Report.

90.     Third, the methodology identified in the Report to calculate player losses is woefully inadequate.  According to the Report, "[t]o the extent the fraudsters won any amounts, the contribution by each innocent player was recorded into a loss column for that player, **which was offset by the amount won by the innocent player from the fraudsters.**" (bold added).

91.     To understand how flawed this methodology is for calculating player losses, it is important to realize that the essence of winning poker is not only getting paid when your hand is best, but also losing the minimum possible when your hand is beat.  There is an old saying in poker that, "money not lost is as good as money won."[33]  The key to the massive success of the cheating players is not simply that they were able to profit by bluffing when their opponent was weak or betting when they had the best hand, but that they were able to fold and not pay players off whenever their hand was strong by not the best.  Thus, every time a player had a flush, the cheaters would fold a lower flush or straight; every time a player had a full house, the cheaters would fold a flush.  Whenever a player paired an Ace with a King kicker, the cheaters could fold Ace-Queen without a second thought.  Players lost a massive amount of expected value in such hands, yet whatever amount they won when their cheating opponent folded was subtracted from their "refund," even though the "perfect play" of their opponent cost

---

33 In his seminal work, *The Theory of Poker*, David Sklansky writes:
> In most games the bets you save are as important as the bets you win, because your real goal is to maximize your wins and minimize your losses.  Ideally you want the pots you win to be as big as possible and the pots you lose to contain nothing more than your ante.  You must remember that reducing losses—by not making the calls, for example, that a weaker player would make—adds much more to your win when the game is over.

Two Plus Two Publishing, 4th Ed. (2004) at 6.

them when compared to what they would have won but for the cheating. An accurate determination of the amount lost by players to cheaters would have to take into account not only the money players lost to the cheaters, but also the money that they did not win as a direct result of the cheaters' unfair advantage. The methodology developed and used by UltimateBet to determine refunds serves its own interests and substantially understates the players' actual losses. Thus, plaintiffs have been forced to bring this action so that an impartial tribunal—not the perpetrators of the fraud—can determine the facts as well as the damages plaintiffs suffered.

## FIRST CAUSE OF ACTION

### (Racketeer Influenced and Corrupt Organizations Act)

92.     Plaintiffs reallege paragraphs 1 through 91 of this Complaint.

93.     This is a civil action brought by plaintiffs under the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations, 18 U.S.C. § 1961 et seq.

94.     Each plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

95.     Each defendant, including corporate defendants, is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

96.     UltimateBet is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) which engaged in, or the activities of which affect, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

97.     Defendants, and each of them, were or are employed by or associated with the enterprise referred to in paragraph 103 and conducted or participated, directly or indirectly, in the conduct of the enterprises' affairs, including through facilitating the operation of crooked online poker games.

98.     Defendants, and each of them, were employed by or associated with the enterprise referred to in paragraph 103 and conducted or participated, directly or

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

indirectly, in the conduct of the enterprises' affairs, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(A) or (B) and (5), that is,

a. Conducting an illegal gambling business in violation of 18 U.S.C. § 1955, and

b. Use of telecommunications to conduct an illegal gambling business in violation of 18 U.S.C. § 1084, and

c. Use of the facilities of interstate commerce to conduct an illegal gambling business in violation of 18 U.S.C. § 1952, and

d. Receipt of stolen money in violation of 18 U.S.C. § 2315, and

e. Wire fraud in violation of 18 U.S.C. § 1343, and

f. Grand theft in violation of Cal. Pen. Code § 484.

99.    Plaintiffs have been injured in their business and property by reason of a violation of 18 U.S.C. §1962(c) committed by the aforesaid defendants within the meaning of 18 U.S.C. §1964(c), in that monies lawfully due and owing to plaintiffs have been unlawfully stolen and withheld.  The unlawful theft and withholding of monies due and owing to plaintiffs has directly and proximately caused plaintiffs to incur substantial expense to obtain payment of the monies, to lose the use of their money from the respective date of loss to present, and to forego other business opportunities during the period that these monies were unlawfully withheld.

## SECOND CAUSE OF ACTION

(Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act)

100.    Plaintiffs reallege paragraphs 1 through 99 of this Complaint.

101.    Defendants, and each of them, were employed by or associated with the enterprise referred to in paragraph 103 and conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct or participate in the affairs of the enterprise, including though facilitating the operation of crooked online poker games.

102.    Defendants, and each of them, conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct or participate in the affairs of the enterprises referred to in paragraph

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

[103] through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(A) or (B) and (5), that is,

    a. Conducting an illegal gambling business in violation of 18 U.S.C. § 1955, and

    b. Use of telecommunications to conduct an illegal gambling business in violation of 18 U.S.C. § 1084, and

    c. Use of the facilities of interstate commerce to conduct an illegal gambling business in violation of § 18 U.S.C. 1952, and

    d. Receipt of stolen money in violation of 18 U.S.C. § 2315, and

    e. Wire fraud in violation of 18 U.S.C. § 1343, and

    f. Grand theft in violation of Cal. Pen. Code § 484.

103.    Plaintiffs have been injured in their business and property by reason of a violation of 18 U.S.C. § 1962(d) committed by the aforesaid defendants within the meaning of 18 U.S.C. § 1964(c), in that monies lawfully due and owing to plaintiffs have been unlawfully stolen and withheld. The unlawful theft and withholding of monies due and owing to plaintiffs has directly and proximately caused plaintiffs to incur substantial expense to obtain payment of the monies, to lose the use of their money from the respective date of loss to present, and to forego other business opportunities during the period that these monies were unlawfully withheld.

THIRD CAUSE OF ACTION

(Conversion)

104.    Plaintiffs reallege paragraphs 1 through 103 of this Complaint.

105.    Defendants, and each of them, willfully and intentionally converted property and assets of plaintiffs and interfered with plaintiffs' enjoyment and rights to the same, for defendants' own exclusive personal benefit and use, in intentional disregard of the rights of plaintiffs.

106.    Defendants refuse to return, turn over, and release the aforementioned the full amount of such property and assets taken or misappropriated from plaintiffs without

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

35

consent, and defendants continue to unlawfully withhold the possession of said property and assets and are interfering with plaintiffs' rights to the said property and assets. Plaintiffs have sustained and will continue to sustain substantial damages as a result of the conversion in an amount that is presently undetermined.

107. As a direct, proximate, reasonable, and foreseeable result of the above-referenced conduct of the said Defendants, Plaintiffs have been damaged in the sum according to proof at trial, but not less than $154,863.50 with regard to Daniel Ashman, over $500,000 with regard to Brad Booth; over $20,000 with regard to Thomas Koral, over $140,000 with regard to Greg Lavery, over $500,000 with regard to Dave Lizmi, over $100,000 with regard to Joseph Sanders; over $20,000 with regard to Daniel Smith, and over $300,000 with regard to Dustin Woolf.

108. Plaintiffs are informed and believe, and thereon allege, that said defendants, and each of them, engaged in the conduct described hereinabove willfully, wantonly, with malice, fraudulent intent and/or oppression, and in conscious disregard of the rights of plaintiffs, justifying the awarding of exemplary and punitive damages in favor of plaintiffs and against said defendants, and each of them, in such manner as this Court shall determine to be just and reasonable.


## FOURTH CAUSE OF ACTION

### (Interference with Prospective Economic Advantage)

109. Plaintiffs reallege paragraphs 1 through 108 of this Complaint.

110. Plaintiffs, and each of them, derive or derived all or a substantial portion of their income from playing high-stakes poker. To successfully play high-stakes poker over the long term, it is necessary to maintain a "bankroll" that is a significant multiple of the stakes of high-stakes poker game. An excess of funds is required to account for periods of bad luck and random variance in which a player's returns are well below their expected value. When that bankroll is depleted, whether through bad luck, poor play, or

1   being cheated, it is necessary for a professional poker player to play at lower stakes to
2   minimize his statistical "risk of ruin" and to build up the bankroll again.

3       111.    As the sole result of being cheated in games of high-stakes poker,
4   plaintiffs' in this action lost significant funds and were forced to play lower stakes than
5   they otherwise would have and to forgo the profit potential of continuing to play in
6   games where they had a demonstrable profit expectation absent the cheating.

7       112.    Defendants were aware or should have been aware that illegitimately
8   depriving plaintiffs of funds, directly or indirectly, would prohibit them from engaging in
9   future games of high-stakes poker in which they had a positive profit expectation.

10      113.    Defendant intentionally deprived plaintiffs of funds necessary to practice
11  their livelihood and thereby interfered with their prospective economic advantage.

12      114.    As a result of defendants' intentional acts, plaintiffs suffered both short
13  term and long term injury in the practice of their chosen profession in an amount to be
14  proven at trial.

15      115.    Plaintiffs are informed and believe, and thereon allege, that said defendants,
16  and each of them, engaged in the conduct described hereinabove willfully, wantonly,
17  with malice, fraudulent intent and/or oppression, and in conscious disregard of the rights
18  of plaintiffs, justifying the awarding of exemplary and punitive damages in favor of
19  plaintiffs and against said defendants, and each of them, in such manner as this Court
20  shall determine to be just and reasonable.

21

22                          FIFTH CAUSE OF ACTION

23      116.    The acts of defendants described in paragraph 1 to 115 of this Complaint
24  were done willfully, maliciously, outrageously, deliberately, and purposely with the
25  intention to inflict emotional distress upon Plaintiff.  Such acts were done in reckless
26  disregard of the probability of causing Plaintiff emotional distress.  These acts did in fact
27  result in severe and extreme emotional distress.

28

117.    Plaintiffs have played millions of hands of online poker and have been extremely successful doing so.  In the long run all poker players will statistically be dealt the same cards and "luck" or variance will even out.  Thus, the profit expectation plaintiffs have over their less skilled opponents comes from making superior decisions.

118.    As a direct and proximate result of defendant's acts alleged above, plaintiffs were caused to incur severe and grievous mental and emotional suffering.  In particular, the quality of plaintiff's decisions ceased to be relevant to their success in games of poker, a state of affairs that led to depression, an unwarranted and harmful re-examination of their (typically superior) play, and less time spent playing poker.  For some plaintiffs, defendants' actions have led to long term negative physical and psychological effects.

119.    As a result of this harm, plaintiff requests compensatory damages in an amount to be proven at trial.

120.    Plaintiffs are informed and believe, and thereon allege, that said defendants, and each of them, engaged in the conduct described hereinabove willfully, wantonly, with malice, fraudulent intent and/or oppression, and in conscious disregard of the rights of plaintiffs, justifying the awarding of exemplary and punitive damages in favor of plaintiffs and against said defendants, and each of them, in such manner as this Court shall determine to be just and reasonable.

## SIXTH CAUSE OF ACTION

(Unfair Business Practices - California Bus. and Prof. Code § 17200 et seq.)

121.    Plaintiffs reallege paragraphs 1 through 120 of this Complaint.

122.    The acts and omissions of defendants alleged herein constitutes unfair, unlawful, and fraudulent business practices in violation of California Business and Professional Code § 17200 et seq.

123.    Plaintiffs are informed and believe and thereon allege that the conduct of defendants described herein violates the laws: 18 U.S.C. §1961, et seq. (RICO), 18

1  U.S.C. §1343 (Wire Fraud), 18 U.S.C. §2315 (Receipt of Stolen Property), and California

2  Penal Code § 484 (Grand Theft).

3      124.   As a proximate result of the unlawful, unfair, and/or fraudulent business

4  practices of defendants, plaintiffs have sustained actual economic injury and are entitled

5  to full restitution.

6      125.   Plaintiffs are informed and believe, and thereon allege, that said defendants,

7  and each of them, engaged in the conduct described herein willfully, wantonly, with

8  malice, fraudulent intent and/or oppression, and in conscious disregard of the rights of

9  plaintiffs, justifying the awarding of exemplary and punitive damages in favor of

10  plaintiffs and against said defendants, and each of them, in such manner as this Court

11  shall determine to be just and reasonable.

12      126.   Defendants, unless restrained, will continue to take actions to frustrate

13  plaintiffs and those similarly situated.  Plaintiffs and others similarly situated have no

14  adequate remedy at law to prevent or redress this injury.

15

16                     SEVENTH CAUSE OF ACTION

17                            (Fraud)

18      127.   Plaintiffs reallege paragraphs 1 through 126 of this Complaint.

19      128.   Excapsa Software and related entities represented to players that they run

20  "fair and honest" poker games, that the integrity of its software has been verified by

21  independent third parties, and that its operations were overseen by a legitimate regulatory

22  authority.

23      129.   Relying on these and other explicit and implicit representations, plaintiffs

24  participated in high-stakes poker games at UltimateBet.

25      130.   In the transactions referenced in this complaint, defendants, and each of

26  them, acted in concert to induce plaintiff to enter into crooked poker games from which

27  they derived direct and/or indirect benefit.  In the course of these games, significant funds

28  were stolen from plaintiffs.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

39

131.   Plaintiffs are informed and believe and on that basis allege that defendants made these promises to plaintiffs with the intent to defraud plaintiffs and to induce them into a false sense of security with respect to poker games run by Excapsa and related entities at UltimateBet.

132.   At the times such representations were made, and at the times plaintiffs acted in reliance on them, plaintiffs were ignorant of the true facts and therefore acted reasonably in relying on defendants' promises.

133.   As a result of defendants' fraudulent misrepresentations as alleged in this Complaint, plaintiffs have been damaged in an amount to be established according to proof at trial.

134.   The conduct and misrepresentations of defendants were intentional and despicable and have subjected plaintiffs to a cruel and unjust hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

EIGHTH CAUSE OF ACTION

(Negligence)

135.   Plaintiffs reallege paragraphs 1 through 134 of this Complaint.

136.   Excapsa Software and related entities represented to players that they offer "fair and honest" poker games, that UltimateBet's software was secure, that the integrity of its software has been verified by independent third parties, and that its operations were overseen by a legitimate regulatory authority.

137.   Relying on these and other explicit and implicit representations, plaintiffs participated in high-stakes poker games run at UltimateBet.com.

138.   The cheating at UltimateBet resulted from certain individuals manipulating the software provided defendants and said manipulation was possible due to deficiencies in the control systems that were created, implemented and/or used by UltimateBet.

139.   UltimateBet was in a position of trust with respect to player deposits and the games they provided and UltimateBet and had a duty to ensure that players were not being cheated in their poker games.

140.   UltimateBet breached their duty of care with respect to players by failing to run fair games, by allowing their software to be compromised, by failing to detect and/or remedy security flaws in their software, and by permitting cheaters to avoid detection by allowing them to change their screen names and transfer large sums between accounts.

141.   As a direct and proximate result of the negligence of UltimateBet, plaintiffs suffered significant losses, including lost profits and interest, in crooked poker games in an amount to be proved at trial.  All the above damages were directly and proximately caused by the aforementioned negligence and were incurred without contributory negligence or assumption of the risk on the part of plaintiffs.

## DEMAND FOR JURY TRIAL

142.   Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand trial by jury of all issues so triable under the law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand that judgment be entered against each of the Defendants, jointly and severally, in favor of the Plaintiffs:

**A. Monetary Relief**

1. For compensatory damages for damage and injury to business or property in an amount yet undetermined,

2. For damages for injury to business or property trebled in accordance with 18 U.S.C. § 1964(c),

3. For full restitution,

4. For punitive damages of not less than $10,000,000,

5. For reasonable attorney fees in accordance with 18 U.S.C. § 1964(c), and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

41

6. For costs of investigation in an undetermined amount, trebled in accordance with 18 U.S.C. § 1964(c).

**B. Equitable Relief**

1. An accounting of all benefits, consideration, and profits received, directly or indirectly, including, but not limited to, the imposition of constructive trusts with tracing, and

2. Any restrictions that may be appropriate on the future conduct or activities of any person or organization as justice may require.

Dated this January 13, 2012

Respectfully Submitted,

Alan E. Engle
MEADOR & ENGLE
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

42

# EXHIBIT A

**Transcript of Interview with Travis Makar**

**DonkDown Radio, 2/16/2011**

**www.donkdown.com**

[The following interview took place after a newly registered DonkDown user named "Travis" was in the radio chat room during the 2/16/2011 show and claimed to be Travis Makar.  He asked for the number to the show and said he would call in.]

[23:30]

Micon:  Shady call coming in here.  Hello caller, you're on DonkDown radio.

[background radio sounds]

Micon: Hello.  Turn down, turn off your radio, caller.

Makar:  I just did.

Micon:  Ok.  So you're claiming to be the real Travis Makar?

Makar:  Yeah, and if you want me to prove it, you've got Russ's [Hamilton] number, correct?

Micon:  Yeah, of course.

Makar:  Ok, so I could tell you that his number is...

Druff:  Hold on.  Don't, don't.

Makar:  Come on.  I'm not going to give it on air.

Micon:  Just give me.  Hold on, let me take a look at it on my phone and give me the last two digits.

Makar:  Listen, listen, you, I understand it.

Micon:  Easy.  Easy.

Makar:  The last four digits, right?

Micon:  Hold on, let me pull that up, kiddo, so I can.

Druff:  Yeah, Micon doesn't have that memorized.

© DonkDown 2011

Page 1 of 30

Micon: Let me just pull it up.  You know, we're just going easy today.  You know, we're just going real easy today.

Druff: Micon can't memorize that.  You gotta remember, Micon doesn't remember what he was doing half an hour before the show started.

Micon:  But, now, Mr. possible, um, Mr. Makar here, wouldn't this be jeopardizing, you know, you have some legal action that is…

Makar: Yeah, I do.  I do have some legal action.  I also have some things about what was said about the road rage issue and stuff too.

Micon: Ok, of course we'd love to hear them.  So to verify that you do have Russ Hamilton's number, go ahead and tell me, what do you want, the second to last digit or something?

Makar:  Uh, the…21.  How's that?

Micon: Ok, yeah, alright.  Yeah, uh, he probably does.  That sounds about right.

Druff: So how come you're calling from what looks like a Skype number?

Makar: It is a Skype number.  Because it is a Skype number.

Micon: Um, Travis, I'm just going to ask you two or three questions and then we'll have it verified that it is you.  Some stuff that you should know pretty quickly just about yourself.  And, I'm, I'm sort of believing.  Druff is our ultimate, uh, he's our Detective Druff for matters like this.  Druff, do you have something you can ask Travis real quickly?

Druff: [laughs]

Micon:  I can't find anything.  Travis, do you have any poker, any results in live tournaments?

Druff: Well, I have a question.  You have a relative, a female relative, whose name begins with an R.  What's her name?  [pause]  Travis?

Makar:  [inaudible]

Druff: It's cutting out here.  I wish he'd just call from a regular phone.

Makar: Ok. I'll call you back.  I'll call you right back.

Druff: Ok.

Micon:  Ok.  Call right back.

[first phone call ended]

© DonkDown 2011

[30:12]

Micon:  Ok.  Here's a 702 number that's coming in.  Caller, DonkDown Radio.

Makar:  Ok.  Uh, sorry.  I just had to switch phones again.  You've got Travis.

Druff:  Ok.  So why do you have a 702 number if you live in St. George?

Makar:  Uh, a lot of people in St. George have 702 numbers because it's on the border.

Druff:  It is on the border, but I don't see why.  [laughs]  I don't see why you'd have a 702 number.  But I'll leave that alone for right now.  So, what's the name of the…Here's some questions I was told to ask you.  What's the name of the smoothie shop that you go to there in St. George?

Makar:  Orange Peel.

Micon:  Mookman, is that correct, Mookman?

Druff:  Orange what?

Makar:  Orange Peel.

Micon: Alright, we'll just get some verification here from our heavy hitters.

Druff:  Ok, so Mookman is giving the thumbs up.  So, we're going to take a flop here and we're going to assume that you really are Travis Makar.  How did you hear about this show and what made you want to call in?

Makar:  Uh, well, google does a notification every time my name pops up, and a couple of weeks ago when you were doing the pranks on Russ, it popped up.

Druff:  Ok.

Makar:  So I was listening this whole time.

Micon: So you did listen to the pranks on Russ.  Funny?  Funny or no?

Makar:  Oh, yeah.  They were funny.

Micon: Alright.

Druff:  And did you like the one last week with Phil Hellmuth?

Micon:  Where I claimed to be.

Makar:  Yeah, you know, I got the same spoof programs and, you know, things like that.

© DonkDown 2011

Micon:  So, now, now, Travis, you have, what can be considered… I mean, I had never heard your name until the UB, you know, the whole scandal thing came out.  So, now, what was your… I know you said you also wanted to respond to some of these recent charges on the road rage incident.  And of course…

Makar:  Well, you were saying I was out and I got arrested for road rage and stuff like that.

Druff:  Well, that's what we read in the article.

Micon:  That was the report.

Druff:  That you got arrested for impersonating a police officer when some punk kids were messing with you on the road.

Makar:  No, that's not, not what happened at all.

Druff:  Ok, so what really happened?

Makar:  Some guys were chasing my son in a vehicle, him and his friend.  And they were afraid, and they didn't know what was going on.  They called me and says we don't know what to do.  And one of the kids, my friend's kid, actually his father was a cop.  They called him, he didn't answer, they called me.  I blocked the kids off from chasing my kid and because I blocked them, blocked their access, that's considered kidnapping.

Druff:  So you never actually put them in your car or anything like that?

Makar:  No.  I never even seen them.  I never even…uh, they never even got out of their car.

Druff:  So you blocked them to what?  From leaving the area or blocked them from getting towards your kid?

Makar:  I blocked them from being able to… I blocked them from being able to chase my son. My son made a left, they tried to make a left.  I went straight to block them off so they couldn't go left.  They pulled over to the right, and that's about where it ended.

Druff:  Ok. So, I mean, I'll tell you honestly.  I don't care that much about this.

Makar:  I was arrested.  I was arrested.

Druff:  Yeah, so why were you arrested for this if all you did was separating these people from harassing your kid.  I can't see you being arrested for that sort of thing.

Makar:  That's, well, that's what my lawyer is doing right now.  They arrested me, I posted my bail, and, uh, got my lawyer.  And the lawyer came down here.  And, you know, same thing.  We're going to file charges against them for the same thing.

© DonkDown 2011

Page 4 of 30

Micon:  Well, Druff, this is a minor incident.  And, obviously, Travis, the way that we work on this show, you can feel to speak.  You know, if there's stuff you want to get out there then this show is very much for that.  To give you time.

Makar:  Well, within reason.  Like I said, I have a, you know, pending case going with that.  And I have a pending lawsuit going right now, you know, with a few people that are part of the scandal.  I can't name names, but they know who they are. Names that have never been brought out.  There's...

Druff:  Oh, so, now you're talking about, now you're on the UB topic.

[34:11]

Micon:  Well, and that's what I want to discuss, Travis.  Wicked Chops came out with a report basically saying that you were Russ's sort of right hand man.  You owned a computer shop.  That you would be the one that he might turn to for...  Now, this is, again, according to Wicked Chops.  So, is there anything you can say as to that?

Makar:  Um.  Yeah.  Russ and I actually were very, very close friends.  I owned a computer store for several years.  I basically serviced computers for most of the top players out there.  Um, you know, and, again, as I said, you know, I serviced computers for Phil, Annie.  I've serviced them for Freddy Deeb.  I've serviced them for Scotty.  I mean, I serviced computers for everybody.  And that's pretty much what I did.

Druff:  But did you ever have, did you ever actually work for UB?

Makar:  Never.  Not once.  Not, not...never made a penny from them.  Never worked for them.

Druff:  Ok, so this is what everybody is so interested in regarding you and your family in relation to Russ Hamilton is that your name...

Makar:  I know and that's...

Druff:  Your name and your wife's name and your Mom's name were all attached to cheating accounts that were used and...

Makar:  Yes, I understand that.

Druff:  That were used.  I'm sorry, go on.

Makar:  Well, for some reason, UB decided to do that, but even...  Not that I'm defending Russ.  But they had never even made a phone call to me to ask me anything.  They never even called me to say what's going on.  As a matter of fact, they still send me e-mails on updates of that's going on with their site.

Micon: [laughs]

© DonkDown 2011

Druff:  Well [laughs]

Micon:  To be fair, they haven't been playing great in a very long time.

Druff:  Yeah, I mean, there's a lot of incompetence going on over there.

Micon:  Ok, so now Travis.

Makar:  I'm sorry, what?

Micon:  There's just a lot of incompetence.  Like, they released Prahlad Friedman's name a few weeks before.  Thumbs up their asses.

Makar:  They released what they wanted to release.  Because there was other scandals that were going on that they wanted to cover up.  There was so much other cheating going on that they didn't want that out there.

[36:25]

Micon:  So you're saying that the Russ Hamilton, or the quote Russ Hamilton cheating on UB is only the tip of the iceberg?  That there were others going on?

Makar:  Aw, jeez, yeah.  Yeah.  You know, like I said, Russ and I were close friends.  We're not anymore.  Um, I was close friends with a lot of other people at UB, but, you know, it got to the point where it was a joke.  The people that mostly did the scam walked away from this.  Their names were never mentioned, never brought out.  They didn't face any charges.  Nobody's faced charges.  Um, hand histories that were missing, I know where those are.

Micon:  Really?

Druff:  Really?

Micon:  Really?  Do you have them?

Makar:  I got so much documentation because these guys were such idiots they, even after all this happened, they left things so wide open for people to go in and get it.

Micon:  So, Travis...

[Druff and Micon talking over each other]

Micon:  No, Druff, me first, me first, me first.  Do you have the hand histories?  Or could you access them?  Could you get them for us?  And by us I mean, you know, the poker world?

Makar:  Well, my lawyer has them.  I even have recordings of, uh, all these people in our offices sitting there coming up with...

© DonkDown 2011

Page 6 of 30

000049

Micon: Whooooaaa.  One time, could we get some of that.  Oh, one time, Druff.

Druff:  Well, it doesn't sound like he's handing this to us right now.

Makar:  No, no, I can hand them to you.

Druff: Oh, you can?

Micon: Yes, yes!  Today.  We'll post it instantly.

Makar:  It's actually a federal case so it's not like, you know, I can just turn over that kind of stuff.  I'm talking about, you know, recordings, text messages, e-mails, the programs itself that were used.

Micon:  Is there any of this that you could give us?

Makar:  No. Sorry.

Micon:  We would love to show the public what this is.  And, really, the poker public, I mean could you imagine...

Druff:  I think he just said no, I'm sorry.  So let's move on to some questions, here, instead of trying...

Makar:  You're talking about a federal case, though, involved here, not just...

Micon:  What case?  Cause like you said, no charges...

[38:36]

Druff:  Micon, Micon, hang on here.  I have some questions.  Russ Hamilton, was he fully guilty, not guilty or somewhat guilty but not as bad as they're portraying it?

Makar:  I'm going to put not as bad as they are portraying it.

Druff: Ok.  And, uh, so, what about you?  You and your wife and your mother had... your accounts were used for the cheating and I assume for cash outs too.

Makar: Ok.  My mother.  I don't even know how they came up with her name.  She has never taken a dime from anybody.  Matter of fact, she still has an account on Ultimate Bet that she's played with from probably since the day Ultimate Bet started.  She occasionally plays on there.  My wife's account, um. There was a handful of accounts that were used for, like when pros would come into town and somebody would say, hey, I need money transferred into my account.  And, you know, that was back then kind of the standard, you know, money would be transferred around to players.

Druff:  But why would your wife need to do that?

© DonkDown 2011

Makar:  Because she had created the account.  She was at home, I called her up and said, you know, can you create me a couple of accounts?  And they would just transfer the money around and, you know, unfortunately.  It's like the iliketowin account, I believe, if I'm not mistaken, that was under her name, but that was my, that's been my screen name, forever.   I used that on Ultimate Bet, I used it on Bet 21, and I used it on Ultimate Blackjack Tour.

Druff:  But, what I'm not understanding is that if people needed to trade money around and you had your own account, why didn't you do it?  Why'd you have to get your wife involved?

Makar:  It wasn't…She, she played on the site too.  So, she would create accounts and, in the beginning, she'd create accounts.  You know, they always encouraged all of us to create accounts and play to keep the rooms going.

Micon:  Oh, ok, I see.  So you're telling me…

Makar:  Accounts were created and then at some point somebody would say, oh, well, she has an account, we'll just transfer the money to that account and then you can do what you want with it, you know, transfer it to this person.  I'm talking about people high up.

Micon:  They were encouraging…

Druff:  So, were you a prop player?

Makar:  No.  Just as a favor, you know.  I serviced the computers and stuff like that.  And they were trying, in the beginning, they were trying to get as many people to keep the rooms busy.  So, it'd be like, you know, get your family, get your friends, get everybody on there.

[41:12]

Micon:  Travis, the major allegation here is that.  Let me just ask you a question.  The major allegation here at least that came out was that Russ Hamilton sells a house to either your mother or wife or something.  Is that true?  Is that totally made up?  Because I believe somebody accessed the property records.

Makar:  The house idea was, um, uh, the house on Glenview.  I originally bought the house, and I had rented it.  This is when, God, I don't even know the year now.  This was back when I think things were really starting to go with UB, and Russ didn't want to have a bunch of properties in his name.  And I says, hey, I'll buy this house if you agree to rent it from me for 3 years.  So, I bought the house, he rented it for 3 years.  Later on down the line, I no longer wanted to keep the house.  I wanted to sell it.  He wanted to keep it.  So, he bought it from me.

Micon:  Hmmm.

[42:17]

© DonkDown 2011

Druff:  So when did your friendship with him end?

Makar:  Uh, I'd say probably about a year ago, year and a half ago.  I just got fed up with things.

Druff:  And what were you fed up with?

Makar:  Um, him covering for people that I don't know why… that he's letting them slam him.  And when he gets slammed, I get slammed.

Druff:  Yeah, that's what I was wondering.  I'm wondering why is everybody's name who was involved in this covered up, except for Russ.  Why is he the only one named and why doesn't he come forward and say…

Makar:  I honestly couldn't tell you.  I honestly couldn't tell you why he wouldn't come forward.  Some kind of loyalty, something.  Um, like I said, I just know the people that got away with the big bucks, they still have it.  Um…

Micon:  Who would those people be?

Makar:  All these companies, these shell companies that they shuffled stuff around.  Even with knowing the truth, is so hard to follow, it's virtually impossible to follow it even when you know the facts.  As far as how they shuffled companies and businesses around.

Druff:  I've already seen some evidence of that.  But, um, about you.  Did you ever cash out with your account with any money Russ shipped you?

Makar:  Did I cash out money that Russ shipped me?

Druff:  Yeah, because this is what it appears.  What it appears is that…

Makar:  I'm sure I cashed out some money.  I mean, you know, not that I cashed out the money and kept the money for myself.  But, but, you know, people cashed out money all the time.

Druff:  The thing is, like, 20 something million dollars at least got cashed out at UB.  And Russ didn't do this all himself.  He shipped it around to various accounts and those people cashed out.

Makar:  No, no.  That isn't how, that isn't even how it worked.  You know, all these other sites too that claim to be so innocent .  You know, money was transferred, or traded between companies too.  UB money was traded for other sites' money, which I'm not going to say their sites and have them jump all over me.  But, you know, they traded money back and forth all the time.  So, it's not just money that's cashed out, it's money that was transferred, it's money that was used to grow the business, it was money that was used to start other businesses, you know, that people still have, own them.

Micon:  Sure.  Club UBT for instance?

© DonkDown 2011

Makar:  No, well, not Club UBT.  I actually invested in Club UBT.  Now, get this.  I also bought shares in Ultimate Bet when it went public and they did that friends and family thing.  I bought shares in it, and, um, you know, just as an investment, stock.  And, uh, just out of the blue they decided to remove my name off the shareholder list.

Druff:  Yeah, I heard about that.  Didn't that also happen to Annie Duke?

Micon:  Did you have Excapsa shares?

Makar:  Uh. Whether her name was removed or she chose to have it removed, I don't know.

Druff:  Are you talking about Excapsa?  Is that the shares you're talking about?

Makar:  Yeah, yeah.

Druff:  So they cancelled your shares.

Micon:  And for those of you who are having trouble following that is one of the shell companies that owned UB, and it has been owned by I want to say five, at least different companies since Excapsa.

Makar:  Yeah.  And the real owners, you know, from the beginning have owned it as well.  And even up until the very end where they said there's new ownership in there, that's not true.

[45:59]

Druff:  So, Jim.  What about Jim?

Makar:  Even with AP.

Druff:  It's being said in the chat room that...

Makar:  My brother?

Druff:  Yeah.  It's being claimed that [he said] you were very much involved in this whole thing.

Makar:  My brother is – this is my oldest brother we're referring to – he is, in my opinion, the biggest lowlife scumbag in the world.

Micon:  Fair enough.

Makar:  He got... We have been... We haven't spoken in 10 years maybe.  I don't know how many years, but it seems like forever.  But, basically the story with him was my mother had gotten a very large inheritance from a close friend of hers.  And, at the time, my brother owned a house that my mom pretty much paid for already anyways.  And he hadn't worked a day in his life.  Because he was dodging child support, and, you know, Minnesota was coming after him for unpaid child support.  So, he couldn't go out and get a job so he did eBay.  That was his only income other than my parents gave him money,

© DonkDown 2011

and my Mom had even given his wife a job.  And he decided - when my mom got this inheritance, he got a small inheritance from it too - that he wanted a small house.  He wanted her to buy his house at top price, and then he says I also need another $100,000 so I can pay my new house off so I don't have a house payment.  Well, I usually handle the finances for my family, and I said no, that I would not do that, that that money belongs to my mother.  It's not going to go to pay your house off so that you can just live free of charge.  And he got mad and, when he sold his house, he moved to Ohio, and he's bad mouthed me ever since.  Matter of fact, I won't speak to their family because his wife, I found out later on...  Our oldest son died 3 years ago, and I found out that his wife was doing drugs with my oldest son.

Druff:  Well, that's some story there.  So, you're saying he's just completely lying about you because the guy isn't a good person?

Makar:  His own wife had an account on UB.  His wife, Lisa, had an account on UB.

Druff:  That doesn't really say that he's lying here.  That just says he had an account on UB.  I'm just asking...

Makar:  Oh, I'm sorry.  Maybe I...

Druff:  I'm just asking why would he claim that you were a very big part of the scandal.  Is he just making it up?

Makar:  Just to be a jerk.  I haven't spoken or heard from him in forever until all of a sudden on, I don't even know what site it was, 2+2 or something like that, somebody started posting that they had spoke to my brother, and he was saying this about my mother.  I mean, even my mother doesn't speak to him.

Micon:  You're basically just saying that he would be willing to talk shit about you if somebody contacted him asking for information about you?

Makar:  Oh, yeah.  He'll say anything, yeah.

Micon:  Ok, alright.

[49:14]

Druff:  Ok, so something else here.  Are you saying here that you and your mom and your wife did not cash out large sums of money on behalf of Russ Hamilton?  Because that's what everybody seems to be most concerned with.

Makar:  Um, I'm not exactly sure how to answer that.

Druff:  I'm not talking about like $10,000.  I mean, like, over $20 million, even if not all of it got cashed out from the site, a large sum of money was cashed out of the site from the cheating and someone had to do it.  And it was accused that you guys were the ones who did a lot of it.

© DonkDown 2011

Makar:  If you're talking about large amounts of money, then no.  We had nothing to do with that.

Micon:  Webster's dictionary defines money laundering as funneling a large sum of money through an intermediary.  So, you're saying that you were not that intermediary or at least you were not that main source, that main intermediary.

Makar:  Nope.  Nope.  No, but I know who was, and I even have the hand hist, or the histories, the cash out histories from the site.

[50:16]

Micon:  Now, Travis, I have a couple of questions about this.  It's well known that Russ, he's playing poker in Florida.  That's where we like to prank him, which I think obviously we'll try to do tonight.  You can stay on the phone if you want when we prank him too.

Druff: [laughs]

Makar:  No, my lawsuit states that I can't speak to him.

Micon:  Sure.  So there's a, there's a...you said that you can't give us that information because of charges that have been brought, but then, well Russ, of course, it doesn't appear that any charges have been filed on this matter, though.

Makar:  The problem is that with certain documentation that I have, it falls under federal laws and they are determining whether or not they want to go federal with it and I would then, you know, be liable to testify because I have the evidence.  And how I obtained the evidence.  So, it's, it's...again I can't get into too much detail.  That's, you know, really between me and my attorney, it's just I finally got fed up with it.  I went to the attorneys, talked to them, showed them what I had.  Um, and, again, like I said, these people that are so smart, that were able to do all of this stuff, were just dumb.  They left evidence laying all over the place.  I mean, there's people in Costa Rica that were scamming the company.  There's, you know... It just goes on and on and on.

[51:47]

Druff:  Well, it's interesting you mention that.  So, first of all, how much do you know about the connection to Absolute Poker?  Uh, like, uh, guys like Scott Tom, Phil Tom, Oscar Hilt Tatum.  Do you know those guys?

Makar:  I have, I have.  No, I don't.  I've never met them.  Um, I have a very large file on them, but I've never met them.  And, again, I'm not in the poker industry type thing so a lot of these files, I really don't even know what they actually mean.

© DonkDown 2011

Druff:  And do you think that the AP scandal, the one that occurred on there with Greycat and all of those other names, was that a separate scandal from the UB scandal happening separately or was, was…were they in on the whole thing together the whole way?  Or you don't know?

Makar:  Um, I don't really know.  My understanding is it was the same program that was used.

Micon:  Really?

Makar:  So, other than that, I don't really know, as far as…  Like I said, I never met those people, I never even met, like, uh, uh, I don't know what his name is.  Joe Norton and this Joe Sebok that released stuff saying that…

Druff:  Well, Joe Sebok just came on in the last year or so.  So he wasn't part of the cheating.

Micon:  Yeah, he really took the hard line.  He really took the hard line or at least tried to.

Makar:  I'm just saying as far as releases, like press releases he did, where he mentioned my name.  You know, these people never even bothered to try to call me or e-mail me.  I still have the original e-mail.

Micon:  So, are you suing for slander in this matter?  And also, there's one other question…

Makar:  No, I can't sue for slander.  The statute of limitations is up for slander.

[53:28]

Micon:  One of our devoted UB/AP, u, one of the guys who has been very vigilant in trying to dig up all he can on this matter asks, did you own the UB account 21?

Makar:  [Pause] Yes.

Micon:  Ok.

Druff:  Ok.  I don't know what else to follow up with that, but that's what the person asked.  What about Greg Pierson, did you know him?

Makar:  That's because 21 was, you know, one of the names used for cashing out money.  Now, because I owned it didn't mean I used it.

Druff:  But, ok, if it was used to cash out money, wouldn't the money be coming into your bank account or your name?

Micon:  But, I think he's saying, and, tell me, Travis, if I'm right or not, it might have your name on the account but it's not always under your direct control.  You might not always even have the password.  Is this, is this right?

Makar:  Very close, yes.

© DonkDown 2011

Page **13** of **30**

[54:23]

Druff:  Ok.  What about Greg Pierson?

Makar:  What about him?

Druff:  Do you know him?

Makar:  Yes.

Druff:  How well did you know him?

Makar:  Fairly well.

Druff:  Ok.  Are you able to comment on what you feel his role was in this whole thing?

Makar:  Um, I know exactly what his role was, but I can't comment on it.

Druff:  Ok, because he's been one of the accused and, uh, there's been other names thrown around. And I'll give one for example.  Like Freddy Deeb.  He has never been formally accused, but...

Makar:  No.

Druff:  So you're saying he's innocent, Freddy Deeb?

Makar:  If the worst thing Freddy Deeb probably has done is, probably somebody probably transferred money to his account and asked him to pay somebody.  That's probably... But, again, you're talking about way back in '05, '06 where it was pretty well common practice for somebody to transfer money to another player and say, hey can you do me a favor, can you cash this out and pay so and so.

[55:23]

Druff:  What about KrazyKanuk?  Did you know him pretty well or not?

Makar:  Yes, I did.  Him and Monica, I knew them too.

Micon:  Yeah.  Monica.  The blackjack tour.  Blackjack Monica.  Big ups.

Makar:  [laughs]

Micon:  She had a real set of, uh, a real set of personality.

Makar:  Yeah, I knew them.  I've been to Aruba all the time with most of the tournament stuff cause I was always taken down there for the computer stuff.  Like I said, I did, you know, most of the big name players, I serviced their computers in one way or another.

© DonkDown 2011

Micon: But, you're saying you did not hole card, you did not cheat, you did not benefit from the cheating?

Makar: Nope. And I could tell you 100% I never used the program that was used for this. Never used it once.

Druff: Well, I don't think that's what really being accused, though. I don't think people believe that you were, at least, I think most of the people.

Micon: They believe that you benefitted from it.

Druff: They don't think you actually did the cheating. They think that after Russ and others cheated, they needed somebody to cash out money and got people who hadn't otherwise been doing anything wrong, to cash out for him.

Micon: Funnel money, through an intermediary...

Makar: If I cashed out any money as... At one point, like I said, I had my own store, I made a good living and towards the end I actually went to work for Russ and then went to work for UBT, which was the Ultimate Blackjack Tour. I actually invested $250,000 of my own money in that company that I lost.

Micon: Oh, hold on, we have a...

Makar: I went to work for UBT. And basically did everything for Russ.

[bad decision clip from NBA Jams is played]

Makar: I handled everything. I'm sorry, what was that?

Micon: I'm sorry, it was...

Druff: It was a little sound bite.

[bad decision clip from NBA Jams is played]

Micon: It was a bad decision from NBA Jams that we play.

Makar: Oh. I mean, I handled everything. I paid bills for him, I, you know. I was basically like an assistant to him. So... and, again, he wasn't very good on a computer either so he needed a full time tech.

[57:29]

Micon: So, you never saw this thing in action? You never saw the cheating program? The quote..

© DonkDown 2011

Druff: Yeah, did you ever know it was, did you even know this was happening? When did you become aware that Russ was cheating?

Makar: No, I did not know it was happening and that's part of the lawsuit is how they got me involved in it. Um, yes, I've seen it. Um, no, I did not know what they were doing with it.

Druff: Hmmm.

Micon: Alright.

Makar: Sorry, I can't make it more clear. Yes, I've seen it used. I've seen, you know, how it was used, but didn't know what it was being used for. I didn't know. Again, it's just like, I could say, like, say Annie Duke said she knew there was a superuser program out there. But it was used for, uh, fraud prevention.

[58:26]

Druff: Ok, here's a question from someone in the chat room, and I've wondered this myself. I'm mainly a limit hold 'em player, and I played a lot of limit hold 'em at the high limits on UB and so did one of our users here krose. And I don't know about krose's results, but I always just got slaughtered in these limit hold 'em games on there frequently against accounts - I didn't play a lot of heads up on there - but frequently people I'd never seen before were there and didn't seem very good at all, and I'd get crushed against them. And when it came down to supposedly calculating the refunds due I was given very little, like $2,000. And I did the worst on UB by far of any site. So...

Makar: Half the stuff you just said lost me because, again, I'm not a poker player, and I actually don't even like to gamble. Um, I did play on the Bet 21 and, you know, the Ultimate Blackjack thing because that was something I was capable of playing, but as far as, like, your question about the refunds, there's a lot of names out there that were never released. User names.

Druff: So, but you don't even know the types of games that were being cheating early on, like limit hold 'em, no limit hold 'em, tournaments?

Makar: No.

Druff: Oh, ok, you don't know. Ok.

[59:36]

Makar: At that time, I couldn't even tell you the difference between limit and no limit, so, you know, no. But I can tell you that the amount of names that were released that were supposedly cheating names is just a fraction of what really was out there.

Druff: And is that the reason they are holding back the 10% of hand histories? Is because that will reveal more names?

© DonkDown 2011

Makar:  Um, I don't think they're going to release any more names.   A lot of data was deleted and removed.  A lot of data was removed from backup systems.

Druff:  But is that the reason that they removed it, is to cover up the additional names?

Makar:  Um, I would assume they removed it to cover their self, their own ass.  But, again, I…

Druff:  So, the question is why are they willing to give out 90% of the hand histories and not the other 10%?  What do the other 10% show that they don't want to be seen?

Makar:  Well, the other 10% from the recordings that I listened to when these people were in there talking to their lawyers, um, they were busy deleting a big part of those hand histories so that they couldn't get caught.

Druff:  So you think they were already deleted a long time ago?

Makar:  Oh, I know for a fact that one person was in the system deleting, um…

Micon:  They deletin' everybody out there.

Makar:  …all trails, you know.  So they were sure it couldn't come back on them.

Micon:  But do you have it?  But you have a lot of this and can prove a lot of this?

[61:11]

Makar:  Yeah, I have all the actual auditor re…See, this is, this is a really interesting part here.  I guess I can probably go for this.  I may get bitched out by my lawyer, but we'll see.  Um, one of the things that Russ had did was Russ had went into a meeting with several people – I'm not going to name who it was – several attorneys as well as several higher ups in the companies.  And they proceeded to sit down and talk about how they were going to solve this problem after, uh, Brainwashdodo released a handful of documents.

Druff:  Yeah, that's interesting.  I was going to ask about Brainwashdodo, but go on.

Makar:  Yeah, I know who he is.  But after they released a handful of documents, they started panicking because originally they weren't going to release any of this stuff.  They were just going to shuffle this off just like AP did.  So, they were going to come up with a way of getting around it and then when this Brainwashdodo released some stuff they kinda got screwed.  They went into a meeting.  Russ decided that he was going to record this meeting to protect himself.  Well, again, at that time, I was still dealing with Russ, and I was still working on his computers so he downloaded the recordings that he taped down to his computer.  So, I was able to copy those off and listen to them.  And they're, you know, 6 hour long recordings of their meetings where they're talking about what they're doing, how they're going to do this, who was involved, you know, how to cover this up, how to cover that up.

© DonkDown 2011

Druff:  Interesting.  And Mookman5 in our chat is saying that, uh, one of the UB's first press releases, that they were going to pin it on you and your family mostly.  Were you aware of that?

Makar:  Yeah, actually it was in the recording.

Druff:  It was in the recording.  Ok. And, uh...

Micon:  Why you?  Why'd they choose you?

Druff:  And Brainwashdodo, for those of you...for the users who don't know, he was someone who showed up on 2+2 with a Costa Rican IP address and didn't speak that good English, but spoke good enough English – or wrote good enough English – to reveal a whole lot of company internal stuff for UB to where that...

Makar:  He released a little bit of stuff, and I have everything he has.

[63:35]

Druff:  Yeah, so what was his deal?  Why did he do this?  Who was Brainwashdodo?  You don't have to name him, but...

Makar:  He worked for them.  He got passed up for management.  He was pissed off.  He decided to, he didn't even know who half the people were so he just went and logged in and started typing in, like, look up players by money amounts, you know, that had been in their accounts, copied out of the data, he started e-mailing it to himself, the screen shots to himself.  And he first started to bribe, uh, uh, what was his name back then?  Uh, who was the guy...

Micon:  Paul Legett.

Makar:  who was running UB at the time?  Uh...down in Costa Rica.

Micon:  Not Paul Legett?  Mookman will have this.

Makar:  After Jim Ryan.  Um.  I can't think of the guy's name.  The guy was actually...

Micon:  After Jim Ryan, Mookman.  He said after Jim Ryan is Paul Legett.

Makar:  Yeah, yeah, Paul Legett.  That's it.  Yeah, Paul Legett.  So, basically, um, Mook, or uh – I'm sorry Mookman, uh, he – I was going to say the guy's real name even too – um, Brainwashdodo basically was blackmailing Paul Legett, and Paul Legett would only agree to pay a certain amount of money to keep the data quiet.

Druff:  [inaudible]

Makar:  I'm sorry, what?

© DonkDown 2011

Page **18** of **30**

Druff:  No, go on, tell the story. I'll ask the questions later.

Micon:  Well, they probably got the deal done.

Makar:   He then at that point decided that wasn't enough money and he didn't really know who to contact so he just put some of the information out there on the internet figuring he'd grab some attention.  And when he grabbed enough people's attention, some of the highers up, then, you know, paid attention and contacted him.

Micon:  According to Haley Hintz, it was, Brainwashdodo was paid $80,000, according to Haley Hintz.

Makar:  No.  Uh, that was what he was offered from Paul.  I got that e-mail too.

Druff:  So he got more than $80,000?

Micon:  Oh my god.

 Makar:  Oh, yeah, yeah.  A lot more.  He was given, he... Paul offered him $80,000, which I have the actual e-mail that he sent to Brainwashdodo offering him the $80,000.  It wasn't enough.  He wanted more.

Micon:  So, Travis, you have the treasure trove of UB.  You have the Holy Grail of like e-mails and...

Makar:  I even have the machines.

Micon:  [laughs]

Makar:  I have the machines that were used to do this.

Druff:  [laughs]

[66:22]

Micon:  Can you at least promise us or tell us, I mean, cause if this ends up not having a legal settlement, can you at least release this stuff, you know?

Makar:  If I know that I'm protected and my family is protected, and, yes, then stuff will be released.  But, you know if, um, if you need some kind of actual proof I would probably even arrange just to meet with say you personally and just...

Micon:  Sure.  Sure.  Throw us a nugget.

Makar:  And you could look at it but not copy it.

Micon:  Sure.  Or maybe just like throw us some kind of a nugget, you know what I'm saying.  Something that we can at least put up to say, look at this.  I mean, not like the actual information.

© DonkDown 2011

Page **19** of **30**

000062

Makar:  Well, no, I can't give you anything you could copy and put up, but I could let you just actually look and see what it is so you could then be able to report back that, yes, it's definitely true.

Druff:  Yeah.  Yeah.

Makar:  You would be able to look at the stuff and see it.

Micon:  Anything like that we'd be willing to do.  We'd be willing to work with you on that.

[67:30]

Makar:  My thing is, I just got fed up.  I got fed up with these people in Costa Rica, got fed up with all these other people that have gotten away with this and have continued to let my name go out there and be slammed.  And stupid things, like, where they said my Mom was a porn star and my Mom married a pedophile.  You know, these are all just made up stuff, none of it's even true.  You know, I'm still with my wife here, and we've been married for...how long?

[female in background – "24 years"]

Makar:  24 years.  But, you know, you gotta remember too, 3 years ago, 4 years ago, when a lot of this started to come down, my son was killed.

Micon:  That's awful.

Makar:  And my wife had a breakdown and, you know, I wasn't going to deal with any of this stuff.  And, you know, there actually was death threats at our house.  People were threatening, people were actually peeking over the walls of our house and...

Druff:  Who was threatening you?  Was it people associated with UB or was it angry people who got cheated?

Makar:  Uh, actually, I really couldn't tell you.  Could be both.  Could be either / or.  So, you know, we started having people following us, following us in our cars.  And then there's stuff out there about bankruptcy, how, you know, I was able to keep these cars and my Hummer and how I owed this much on my Hummer.  Even that's not correct.  My Hummer is paid off in full.  The Roadster is the car I bought for my mother, and I paid cash for that and gave it to her.  So, you know, there's just so many things that are, like, misprinted and people run with these stories, you know.  Just like I've seen about this guy who now lives in St. George that played on one of the other sites that lost millions or whatever.

Druff:  Yeah.

Makar:  I don't know if you know the guy I'm referring to.

Druff:  I know who you're talking, yes, yes.

© DonkDown 2011

Makar:  Yeah.  It's not that he moved out here.  He's lived out here forever.  He's voted, like, uh in Mormon country, he's voted, like number 4 of the top 10 most influential people in Utah.

Druff:  Well, it was said this guy was running a lot of kind of credit card scams where he...

Makar:  Yeah, I don't know if he was or wasn't.  But I'm just saying that people starting posting stuff about, you know, he moved to St. George so we could launder money together.

Druff:  Oh, I see.  So you were linked to him is what you're saying.  Even though you had nothing to do with it.

Makar:   Yeah, yeah.  And it starts it up again.  And just like people posted that I owned a check cashing company.  It's because they typed in an address for a business I owned and next door was a check cashing company.  I never owned it.

[70:14]

Druff:  Yeah, I know, there's always mistakes in these types of things.  But, now Russ Hamilton, do you know if he got a lot of threats from people?  What was his lifestyle like during the time you were friends with him after this all broke?

Micon:  Slash how can he be running around playing golf and poker?

Makar:  The best, my understanding is, and, like I said, again, I don't know, there could be money offshore, there could be money... I know some of the other people that, uh, you know, that are the higher ups, definitely have money offshore stashed away, but as far as his money situation I believe that he's getting close to being pretty well broke.

Micon:  Oh, really?

Druff:  Well, where did that money go?  He made a lot of money on the scandal, didn't he?

Makar:  I couldn't tell you how much he actually made and how much...

Druff:  Someone made a lot of money.

Makar:  ...was given to somebody else.

Micon:  Ok, so now you think Russ might be under somewhat of a financial squeeze here.  That's why maybe he's going to Gulfstream playing in the 10-20, you know the 5-10, 10-20 games.  You think that's...

Makar:  Oh, yeah.  My understanding from what I hear about rumors and stuff is that he was going down there because... of course, he still plays golf with people that I've known, and they tell me he goes down there to play.  And then he started getting harassed and he was actually just going down there to make

© DonkDown 2011

a living. But, again, I don't know if that's really 100% true. I could tell you, you know, you could look up public records and find out he's got loans against all his properties. You know, this is a person who had so many properties that were all paid for and now they all got loans against them.

Druff: Well, you know that may be true. In fact, I know Barry Greenstein said Russ is broke. But all this money went somewhere and I'm wondering…unless Russ made a lot of bad investments with the money. You can lose any sum of money if you're dumb enough with it.

Micon: A lot of large sports bets or something.

Makar: Oh, yeah. There's no doubt in my mind, and I know he lent a lot of money out to people and was never paid back. A lot of people, a lot of the…I'm not going to sit there and specifically say their names.

Micon: I've heard Annie Duke. I've heard Annie Duke was loaned.

Makar: What?

Micon: I heard he loaned Annie Duke a large cash number that was just never paid back by her after the whole scandal broke.

Makar: Yes. Yes, that's absolutely true.

Druff: Really? So Annie Duke needed a loan?

Micon: I heard it. It was before…

Makar: She borrowed the money to buy a house in LA.

Micon: Right. That's what I heard.

Makar: And she decided that she's not going to pay it back. And there was stuff, like, even when she was on that Apprentice show. You know, money was being funneled around to people on that show.

Micon: Hmmm. Wow.

Makar: So it wasn't her talent, and it wasn't her personality that kept her on that show.

Druff: [laughs] Interesting.

Makar: And, again, you know, Phil Hellmuth, I think he's a great guy. I mean, I've gone down and dropped off money to him because he was playing in these, like, after dark poker shows, and I was asked to, you know, run an errand. And he would take my son and show him around the set and stuff. He was always great. So, [inaudible].

[73:27]

© DonkDown 2011

Druff:  So, do you think of those two, do you think either were involved in the cheating?

Makar:  Um…no, I don't really think they were involved in the cheating.  I think they, I would say they probably got… one of them probably benefitted more than the other from it because, you know, saying I'll keep my mouth shut but I'm going to benefit, you know.

Druff:  Do you think either of them knew the cheating was going on before it was made public?

Makar:  Um… [pause]  Uh.  I really don't know.  That I couldn't say really either way because, again the cheating was so easily done and the other cheating that was going on even after the scandal thing broke was just blatant that nobody's ever even caught it yet.  It still hasn't been caught.

Druff:  What do you mean by that?

Makar:  Well, um, some of the management, you know, in Costa Rica, were cheating customers out of all kinds of money and that was never brought out.  Nobody talked about it.  Nobody paid back refunds to people.

Druff:  How were they cheating?  Were they doing like the superuser program?

Makar:  Nope.

Druff:  Or were they just taking money out of accounts?

Makar:  Nope.  They had a whole other way of doing it.

Druff:  Hmmm.  Can you tell us how it happened?

Micon:  Or if you can't, can you just tell us the nature of it?  Like, is it a poker cheat?  Is it uh…credit card processing?

Makar:  No.  It was more of a hole that was found.  It was a hole that was found, and they shut down the hole but never made mention of it to anybody, and I have the records of the hole and everything that was discovered.

Micon:  Somebody could just add money to their UB account?

Druff:  What we're asking is when you cheat somebody on a poker site, it can either happen one of two ways.  Either you're playing poker against them and cheating some way at the poker game or it's something having to do with taking money out of their account without them knowing.

Micon:  Or, Druff, what if they could just add money to their UB balance?

Makar:  Ok, let's say for instance I log into your account when you're not there.  Not playing.  And I go and I play against a bunch of people online and I win $10,000.  Then I transfer that money out of your account, and if you're a high enough roller, you're not going to notice that money.

© DonkDown 2011

Page **23 of 30**

Micon:  And what if you lose?

Makar:  So I'm playing under your name and you don't even know it.

Druff:  Yeah, what if you lose?

Makar:  Again, if you're a high enough roller, you're not going to notice it.

Druff:  So, you're saying they gained access to other people's accounts and played and if they lost, then oh well, and if they won, they transferred out the winnings and the person came on with the same balance?

Makar:  Um, for the most part.  As far I know, not a single person ever noticed any money missing.

Druff:  Interesting.  But that's what was going on?  They were accessing other people's accounts is what was happening?

Makar:  Yes.  Yes.  Through a hole that was discovered by just some low, not even a tech person, just some random person that found a hole and, you know, they had their whole call center down there in Costa Rica and I can only imagine that if one person down there knew about it, several people knew about it.  You know, cause, again, you're talking about Costa Rica.

Micon:  Tight community.

Makar:  You know.  [laughs]  It's not the most honest place.

[77:12]

Druff:  Yeah.  And is Brainwashdodo, is he worried, do you know, about any kind of retaliation for extorting money out of the UB people?

Makar:  Well, what would he have to worry about?  He's in Costa Rica.

Druff:  Well, that's what I mean.  Is he worried that someone in Costa Rica is going to come kill him?

Micon:   Yeah, he might have something to worry about.

Makar:  He already had, Paul Legett already had a couple of his bodyguards go and park in front of his house and sit there.  And, you know, to make sure he knew that, you know, Paul Legett was watching him.

Micon:  Paul Legett's watching ya!

Makar:  He didn't seen intimidated by it.

© DonkDown 2011

Page 24 of 30

Micon:  So you're saying that Brainwashdodo still lives, basically, a normal life and is not looking over his shoulder at the filthy UB / AP guys trying to get him?

Makar:  Yep.  It's my understanding that he got a divorce from his wife, I understand, or separated from his wife, and he was supposed to be starting up some kind of company down there that somebody else was paying him to start up some other company, or a company , but yeah.  He may. You know, I kind of wonder myself if he took money from multiple sources, but that I don't know.  I do know of at least one or two sources that he got money from, and I even have the wire transfer papers for that where he was being transferred money to.

Micon:  Boy, I wish.  Travis...

Druff:  Was this guy a Costa Rican or was he an American living in Costa Rica?

Makar:  No, he's I think he's actually, uh, um, he's from another country.  I believe he's from...his family is all from another country, but I believe he's a Costa Rican citizen.  But he's from, like, Denmark or something like that.  I couldn't tell you for sure.

Druff:  Ok.  But the bad English thing wasn't an act, that's really how he speaks?

Makar:  It's actually how he speaks, yeah.  Very broken English.

Micon:  Travis, this is a lot to take in right now.  I just want to say if you, if there's stuff that can be released, if there's things that you have that we could know about or parts that we could verify, I'd be willing to, you know, call up all the boys, you know, the Wicked Chops people and Haley and Mookman and just everybody that's been diligent about this.  I'd love to sort of go over all of this with a fine tooth comb.  Maybe talk to your lawyer and see what you could or could not give us or show us or show us to report  if not giving us the document just so we could...We would love to work with you cause, you know, this story it's been evolving over the last couple of years.

Druff:  And if you could meet with Micon and show him things or whatever in confidence and we could report that, you know, Micon saw it and it's been verified, etc. we'd be very happy to do that as well.

Micon:  Sure.

Makar:  Alright.  No problem.  Like I said, I'll talk to my lawyer and, besides this stuff, you know, I got the criminal charges going on right now that I'm working on.  So.  You know, the ones that were for the supposed road rage.

Druff:  Yeah, we don't really...the truth is if that's what got you to call, we're glad we mentioned it, but we don't really care too much about that.  That's just stuff in your personal life and people have stuff like that in their personal life all the time and we don't report on it.  It's just that, um, obviously we were interested in the UB stuff and I personally...I don't know if you saw the TV specials on 60 Minutes or the CNBC thing, but I appeared on both of those because I was a victim of the scandals on both sites.

© DonkDown 2011

Page 25 of 30

Makar:  Actually, I don't even know what you look like so I wouldn't really know.

Micon:  He's a bracelet winner, Travis.  He's a bracelet winner.

Makar:  But they didn't even ask me if there was anything I wanted to say about anything.

Druff:  Yeah, well.

Makar:  Probably 3 years ago, I probably would have been able to say something, but now that I've waited on and sat on this stuff for so long, that's where I run into the problem.  I guess there's a law out there that states that if you have federal documents as far as a federal case and you hold, sit on those documents, you could get in trouble for it or something like that.  I don't know.  My lawyer tried to explain it.  [inaudible]

[81:35]

Druff:  Do you think that Russ is facing any kind of criminal action against him at any point for this or do you think he's going to get away with it?

Makar:  No.  I think everybody is going to completely get away with it.  There's not going to be any legal action taken.  Um…

Micon:  That's why we need your golden documents.

 Makar:  In the recordings, they sit there and they laugh about how the Kahnawake tribe is doing this and how they turned it over to the authorities.  Well, the authorities were they turned it over to one of the family members whose one of the, like, police officers on the tribe or something.  You know, it's just all show.  It's all show.

Druff:  Well, there's no doubt that the Kahnawake's are a joke.  That that quote investigation was BS, and obviously they weren't looking to uncover anything.  So that was clear from the start.

Makar:  No, they were never going to do anything and from my understanding from the recordings, they weren't even going to bring up Russ's name, that was going to be completely kept quiet and then somehow another it came out and this Brainwashdodo dumped some data out there that made it look like me and they just kind of ran with it.

Micon:  So, Travis, so I can also clear something up here.  You do believe that Russ Hamilton did hole card, like for instance, Mike Matusow in that he was on the phone and he was like hey, Mike, let's play heads up, transfer me on FullTilt…

Makar:  That I don't know.  You know, I don't know if he called somebody up and said…

Micon:  You do know that he hole carded, though?

© DonkDown 2011

Makar: I would have to be with him the whole time to tell you that.

Micon: Do you or do you not believe that Russ Hamilton hole carded on Ultimate Bet for substantial profit for himself and others?

Makar: Um, I would probably say yes. Yeah. I mean, he definitely profited from it, but as far as how much substantial means, compared to everybody else, I don't know.

Micon: Ok.

[83:42]

Druff: About the other names, do you think they're ever going to come out?

Makar: Um, I really don't know. I just don't understand why they haven't came out yet because they're like right out there in front of everybody and they just, nothing happens.

Druff: Well, couldn't you release them at some point when you're allowed to?

Makar: Yes, if and when I'm allowed to, yeah. You know, that's one of the reasons I actually called your show is I just…I actually had my family here the other day and we were talking about this stuff and the pranks you did on Russ and you know it was just…you know, I get irritated when I think about it. Here, I left Vegas. I left everybody I know behind. My wife's family won't even talk to her because they believe the stuff they read on the internet so they don't speak to her because they think she's some kind of cheat online and, you know, it's ridiculous. It's irritating. My wife gets stressed out when she reads stuff on the internet that's not true and is made up. It's not like I was ever supposed to be a public figure here, you know, in this, and somehow I got drug into it and it upsets her. And it upsets my son. You know, I have a 17 year old still and it upsets him too because people do contact him, you know, online. They come across him and make comments at school. Say stuff about oh, your father's a cheat and this and that. So, when we in Vegas and all this started to happen, other kids would approach him and say oh, your Dad stole all this money. So how do you think that would make me feel as a father?

Micon: Sure. Sure.

Druff: Yeah, well. Yeah, we'd definitely like to see as soon as you can…

Micon: I took your number down.

Makar: Well, I called this number last week several times, but…

Druff: [laughs]

Micon: Oh, please don't say that, Travis. Now you're fucking my game up.

© DonkDown 2011

Druff:  Oh, boy.  Yeah, Micon has some trouble answering the phone.  But I'm glad you called back.  So, how did you find out about this?  Was it from the google alert?  Or was it actually someone who told you we were talking to him?

Makar:  Yeah, yeah.  I have the google alert thing set up.  I have my name typed in there and of course it notifies me when my name is brought up, and it wasn't probably no more than 5 minutes past your first show it popped up there.

Micon:  What alert came up?  Something from, like, 2+2, about the site that can't be mentioned?

Druff:  No, we were talking about Travis Makar when we did that prank call.  That's probably what made it come up.

Micon:  Did we type that in anywhere?

Druff:  Yeah, probably.

Micon:  Ok.  Fair enough.

Makar:  Yeah, it came up and said something about... Again every time Russ's name is mentioned, my name gets mentioned along with it somehow.  Um, you know, so yeah, it just pops up.

Druff:  Micon, when Travis was trying to call last week, we were probably taking One Step calls.

Micon:  Yeah, well I apologize for not answering last week.  I'm going to send you a text from my personal cell phone here, Travis.  Definitely want to stay in touch and find out anything you could show me.  Anything you could show me so that I could verify.  Or if there's anything we could report.

Makar:  What state are you in?

Micon:  I'm local here in Vegas.

Makar:  Ok.  I'm actually going to be down in Vegas for my son's birthday so maybe I'll give you a call, maybe I'll meet up with you, maybe let you glance at a couple of the documents.

Micon:  Yeah.  I'd love to.  Again, you sort of understand how this site works.  You know, me and Druff obviously...you have our word, our poker honor word, that anything you release to us cannot be, you know, we will respect your privacy in that matter.  And anything you can, we'd love to see.  Anything we can report on, we'd love to report on.

Makar:  Ok.  Sounds good.

Micon:  Ok, well, thank you very much, Travis.

© DonkDown 2011

Druff:  Thank you for calling the show and telling us what you can.  This has been a very informative segment and we're glad you chose this site to reveal it to.  And, of course, everything on this site, we don't censor anything over here.  This is the one site that doesn't do that at all.

Micon:  Yeah, we don't care.  There's no motivation.  Trust me, we have many times passed up money in order to just, you know, get the real truth out there.  And we do not promote Ultimate Bet.

Makar:  Oh, there's so many people who have cashed out on this deal it's unbelievable.  You guys and us are probably the only ones who haven't.  Oh, my wife wanted me to say something about... To say thank you to Mookman and Rollo Tomasi that she's I guess on here typing to them or something.

Druff:  Yeah, she's in the chat room.  For those of you in the chat, the person who's been chatting as Travis in the chat is actually his wife for those of you who don't know.

Micon:  Yeah, they're just interacting with our users during the show in our little chat thing.

Makar:  Oh, yeah, she just told me to say that so I'm just repeating it.

Micon:  And thank you to your wife.

Makar:  Like I say, why is an account created under her name.  I mean, we've been married this many years, who cares what spouse it's created in.  So, like nobody's going to create accounts under, you know, Paypal.  Like, I use her Paypal account.  So, just because it's convenient.

Druff:  Ok.  Well, thank you for calling in and telling your side of the story.  We're always happy to hear from anybody that...

Makar:  Ok.

Druff:  And we'll be happy to hear from you in the future and maybe you can meet up with Micon and show him some things and we'll definitely be keeping up with this story.

Makar:  Ok, yeah, well text me so I'll know how to get a hold of somebody privately and like I said I'm going to be down there next week so, actually this weekend, so if I can I'll see what I can show.  I know for sure I can't let you copy anything but I can let you see at it least and look at it.

Micon:  You have an iphone, don't you?

Makar:  Yes.

Micon:  No, it's cause his number is almost exactly like my number.

Druff:  [laughs]  No, I see his number is very similar to yours, Micon.  Interesting.

Micon:  Ok, I'm just sending you a text that says Micon right now.

© DonkDown 2011

Makar:  I had to get rid of my original number which was the best number in the world.  I had to get rid of it because so many people calling and harassing.  And we had 7777, so.

Micon:  Awww.

Druff:  Oh, man.  That really hurts.

Micon:  Druff, you're talking to…that really hits home with Druff.

Druff:  That hurts.  I'm a big lover of easy phone numbers…

Makar:  We got rid of all of ours.  We lucked out.  We had 7777, 5555 and 0123.

Druff:  Oh, man.

Micon:  You're giving my co-host here a small woody here so…

Druff:  [laughs]

Makar:  [laughs]

Micon:  Ok, well, we'll be in touch, Travis.

Makar:  Alright.  No problem.  Best of luck.  Bye bye.

Micon:  Bye.

© DonkDown 2011

# EXHIBIT B



       

# Disclaimer

The content of this Presentation has not been approved by an authorised person within the meaning of the Financial Services and Markets Act 2000 ("FSMA"). Reliance on the information contained in this Presentation for the purposes of engaging in any investment activity may expose the investor to a significant risk. Any person who is in any doubt about Excapsa Software Inc, and thereby its securities which are admitted to trading on the AIM Market of the London Stock Exchange plc to which this Presentation relates should consult a person duly authorised for the purposes of FSMA who specialises in the acquisition of shares and other securities.

This document ("Presentation") and the information contained in it is being provided by Excapsa Software Inc (the Company) in connection with a presentation to existing and prospective investors and journalists being carried out by the Company. This document and the information contained in it is solely the responsibility of the Company and its directors.

The information in this Presentation, which includes certain information drawn from public sources, does not purport to be comprehensive, and has not been independently verified and is liable to change. No representation or warranty, express or implied, is made by or on behalf of the Company or any of its shareholders, agents, advisers, officers, directors or employees, as to the accuracy, reliability or completeness of the information or opinions contained herein or in any revision of this document or of any other written or oral information made or to be made available to any interested party or its advisers and, save in the case of fraud, no responsibility or liability is accepted (and all such liability is hereby excluded) for any such information or opinions. No responsibility is accepted by any of them for any errors, mis-statements in or omissions from, this Presentation, nor for any direct or consequential loss howsoever arising from any use of, or reliance on, this Presentation or otherwise in connection with it.

This Presentation and the information contained therein does not constitute or form any part of an offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe or otherwise acquire, any ordinary shares in the Company in any jurisdiction, nor shall it, or any part of it, or the fact of its distribution, form the basis of, or be relied on in connection with, any contract therefore. No reliance may be place for any purpose whatsoever on the information or opinions contained in this document or on its completeness.

Neither this presentation nor any copy of this Presentation and the information contained therein should be distributed by recipients and, in particular, should not be:-

    (a)distributed to persons with addresses in the United States of America, Canada, Japan, Australia, South Africa or the Republic of Ireland, their territories or possession, or in any other country outside the United Kingdom; or

    (b)distributed to any US person (as defined in Regulation S under the United States Securities Act of 1933 (as amended); or

    (c)distributed to any individual outside Australia, Canada or Japan who is resident thereof in any such case for the purpose of offer for sale or solicitation or invitation to buy or subscribe any securities in the context where its distribution may be construed as such offer, solicitation or invitation, in any such case except in compliance with any applicable exemption. The distribution of this document in or to persons subject to other jurisdictions may be restricted by law and persons into whose possession this document comes should inform themselves about, and observe, any such jurisdictions. Any failure to comply with these restrictions may constitute a violation of the laws of the relevant jurisdiction.

This Presentation is being supplied to recipients solely for their information and at their request and may not be reproduced or redistributed, in whole or in part, to any other person, or published, in whole or in part, for any purpose. This document must not be passed, either directly or indirectly, to any person other than an authorised person or an exempt person within the meaning of the FSMA or any order made thereunder or to those persons falling within the following articles of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 ("Financial Promotion Order"): investment professionals as defined in Article 19(5), certified high net worth individuals as defined in Article 48(2), persons falling within Article 49(2), certified sophisticated investors as defined in Article 50(1) and self-certified sophisticated investors as defined in Article 50A. In order to qualify as a certified high net worth individual, you must have a current certificate of high net worth as described in Article 48(2) of the Financial Promotion Order and you must have signed within the last 12 months a statement in the terms set out in Article 48(5) of the Financial Promotion Order. In order to qualify as a certified sophisticated investor, you must have a certificate signed by a person authorised by the Financial Services Authority to the effect that you are significantly knowledgeable to understand the risks associated with certain types of investment and you must have signed within the last 12 months a statement in the terms set out in Article 50(1)(b) of the Financial Promotion Order. In order to qualify as a self-certified sophisticated investor, you must have signed, within the last twelve months, a statement which complies with the wording as set out in Part II of Schedule 5 of the Financial Promotion Order. Persons who do not fall within any of these definitions should return this Presentation immediately to the Company and should not stay for the remainder of the Presentation, and in any event, must not act or rely upon the information contained in this Presentation. By staying for the remainder of this Presentation, each person is deemed to confirm, warrant and represent that they fall under one of the Articles set out above, and accept all the conditions set out above.

The financial information contained in this document has been extracted from the statutory accounts of the Company for the relevant periods.



       

# Overview

## Our Business:

*Excapsa manages a poker network and develops, markets and licenses online gaming software applications, focusing on its multi player, Internet-enabled, real time poker software*

## Our Objective:

*To create an organization that is a global leader in providing the most welcoming, entertaining and enjoyable online gaming experience for our licensees and their customers with a commitment to producing superior returns for our shareholders and a rewarding work environment for talented people.  We will encourage responsible gaming and inspire trust among all stakeholders*











# History & Background

- Online gaming software company for Poker

- Underlying principal licensee business in existence since 2001

- Jim Ryan (CEO) Excapsa Founder, ex Finance Director of CryptoLogic

- Excapsa acquired poker software licensed to eWorld, operator of UltimateBet.com, a top 10 poker room

- 7 licences in operation

- eWorld – largest licensee (approx 97% of revenue)
  - Launched UltimateBet.com
  - UK launch of UltimatePoker.com

- Excapsa re-negotiated eWorld licence agreement – 20 year contract

- Admission to trading on AIM February 2006

000078

       

# eWorld Licence Agreement

## Renegotiated Licence Agreement

- Mitigates against risks associated with loss of a significant revenue stream or customer base

- Higher royalties paid to Excapsa

- Excapsa owns domain names, including UltimateBet.com and UltimatePoker.com

- Continuing right to purchase or assign payment processing and customer support businesses owned by eWorld

- 20 year term with 5 year renewals for successive terms at Group's discretion

- Upon termination Excapsa maintains ownership rights over the customer database



       

# Network Products

**Poker Network Management:**
- Critical mass of poker players for even small licensees
- Shared technical operating costs




**Poker and e-Cash Software:**
- Customised graphics for licensees
- 15 different poker games
- Transaction processing software
- Fraud prevention tools
- Licensee customer support and marketing tools

**Additional Services:**
- E-Cash processing and customer support

 **EXCAPSA** SOFTWARE INC.



000081

       

# Experienced Management

### Senior Management

**Jim Ryan, CEO**
- Company Founder
- Industry and public company experience including CryptoLogic Inc.

**Gail Gleed, CFO**
- Company's CFO since October 2004
- 20 years financial experience including CFO, Internet security

**Uri Kozai, VP Engineering**
- 20 years software development experience
- Executive roles with leading software development organisations

### Board - Non-Executive

**David Peterson,  Non-Executive Chairman**
- Former Premier of Ontario
- Senior Partner and Chairman, Cassels Brock law firm, Toronto

**Bernard Wilson**
- Retired Vice Chairman, PricewaterhouseCoopers Canada
- Former Chairman of the Canadian Chamber of Commerce

**Norman Inkster**
- Former Commissioner Royal Canadian Mounted Police
- Former President of Interpol

**Peter Jensen, UK**
- Former President, Worldwide Supply Operations, Smithkline Beecham



000082

EXCAPSA
SOFTWARE INC.

8

       

# Revenue Model

**Software Licensing Model**
- Royalty based
- 24/7 cash generation
- Scaleable

**Recurring Revenues Generated From**
- Rake from ring games - 79%
- Fees from tournaments - 21%



# Why Excapsa?








- **Company Structure**
  - Control customer database
  - Own software

- **Brand Awareness**
  - Top 10 largest poker network (PokerPulse.com 2005)

- **Significant Growth Opportunities**
  - Casino
  - New network games
  - Other channels of distribution
  - New geographic markets

- **Poker Network's Exclusive Partnerships With World-Renowned Poker Professionals**
  - Input in software functionality and design of the product
  - Valuable connections in the offline poker market
  - Continual branding between top professionals and major licensee

10

000084

EXCAPSA

       

# Network's Exclusive Marketing & Promotional Relationships



- Phil Hellmuth –Accomplishments include 1989 World Series of Poker Champion, 9 time WSOP bracelet holder and 2005 National Heads-up Poker Championship.  Considered the best tournament player on the circuit today



- Annie Duke – Leading poker professional earned over US$3,000,000 in 2004. Sought after for media, movie and television ventures



- Antonio Esfandiari – Youngest person ever to win a World Poker Tour event and a US$1 million tournament. Media sensation for the 21-34 crowd



- Russ Hamilton – 1994 World Series of Poker Champion



- Jim Worth – Tournament expert bridging the online and land-based poker industry



- Jack McClelland – Tournament Director at the Bellagio in Las Vegas, a MGM property



      

# Competitive Advantages



*Product*

Owns and develops

*Robust Technology*

Billions of hands played

*Brand Recognition*

One of the largest poker networks

*Fraud Control*

Tools to identify and mitigate collusion and chargeback risk

*Critical Mass/Liquidity*

Over 25,000 concurrent users

EXCAPSA

*Certified Random Number Generator*

Third party certification from Gaming Associates

*Credit Card Compliant*

Coded transactions only

*Favourable Arrangements With Principal Licensee*

20 year renewable term with eWorld. Player database ownership rights on termination



000086

12

# The Markets

## Global Gaming Revenue Estimates





Online Gaming Revenue Estimates

USSBn

The online gaming market is currently 4.8% of the land based market and is forecasted to grow to 8.4% by 2010.

Source: Christiansen Capital Advisors

13












       

# Market Share

**Total market size**        $3.2 Billion

**Excapsa market share**        4.3%

*Source: PokerPulse, December 2005*

000088
**14**



      

# Customer Acquisition & Retention






| All $ are US$ | December 2005 | December 2004 |
|---|---|---|
| Avg lifetime value of a customer | $579 | $485 |
| Avg lifespan of a customer | 5.7 mths | 4.7 mths |
| | **FY2005** | **FY2004** |
| Avg cost per acquisition<br>- US market<br>- Global market | $115<br>$166 | $97<br>N/A |



       

# Strategy

**Market Driven Solutions**
- Today Poker tomorrow Casino, other network based games and other channels of distribution

**Operational Efficiency**
- Customer oriented and cost effective infrastructure
- Systematic controls to eliminate fraud

**Geographical Expansion**
- Expand presence in UK and rest of Europe

**Acquisitions**
- Facilitate growth of existing solutions
- Target other online gaming verticals

**IPO**
- Value creation vehicle
- Eliminate debt and strengthen balance sheet



# Responsible Gaming

- **Board Level Focus**
  - Compliance and risk committee

- **Random Number Generation Certified**
  - A fair game for players

- **Implementation Of Automated Tools To Verify Players Are Of Age**
  - In progress

- **GamCare Certification**
  - In progress

- **Provides Financial Support To Organisations That Assist Problem Gamblers**








000091
17

EXCAPSA
SOFTWARE INC

       

# Highlights

- IPO on London Stock Exchange (AIM) successfully completed in February 2006 with placing proceeds of £56.2 million and gross proceeds of £26.1 million for the Company

- Acquisition of poker software licensed to eWorld, operator of UltimateBet.com, a top 10 poker room

- Negotiated a 20 year license agreement with eWorld

- Signing of three new licensee agreements with Green Tie Poker, DV8 Poker and Devilfish Poker

000092

**18**



# Net Revenue Highlights








- Based on audited financial statements - 2005 net revenue was $49.5 million up from $4.0 million in 2004

- Proforma financial statements** Fiscal 2005 net revenue increased 93% to $87.6 million from $45.3 million in 2004

- Q4 2005 net revenue was $25.5 million

· Net revenue is defined as gross revenue less bonus dollars, affiliate expenses, host costs and licensee share of revenues.

** Proforma results have been prepared on the basis that the July 28, 2005 purchase of intellectual property and the terms of the July 29, 2005 re-negotiated eWorld license agreement had occurred on January 1st, 2004.



       

# Net Income Highlights

Net income increased significantly

- 2005 net income was $9.1 million ($0.09 diluted EPS) compared to a net loss of $0.4 million in 2004 (negative $431,000 diluted EPS)

- Proforma** 2005 net income increased 104% to $23.3 million ($0.13  diluted EPS) from $11.5 million in 2004 ($0.06 diluted EPS)

- Q4 2005 net income was $6.7 million ($0.04 diluted EPS)

** Proforma results have been prepared on the basis that the July 28, 2005 purchase of intellectual property and the terms of the 29 July 2005 re-negotiated eWorld license agreement had occurred on January 1st, 2004.

000094
20



# Key Financials – Proforma EBITDA *



US$m

FY2004 — 14.3

FY2005 — 27.0

* Proforma results have been prepared on the basis that the July 28, 2005 purchase of intellectual property and the terms of the 29 July 2005 re-negotiated eWorld license agreement had occurred on January 1st, 2004.














000095

 Magic Palace Poker 

# Consolidated Income Statements

| | Year ended 31 December 2005 | Period from 28 April 2004 to 31 December 2004 |
|---|---|---|
| | US$000 | US$000 |
| Royalty revenue | 41,392 | - |
| Software development revenue | 7,716 | 3,963 |
| Other revenue | 397 | 43 |
| **Total Revenue** | **49,505** | **4,006** |
| Operating costs | (34,172) | (3,320) |
| General and administrative expenses | (4,819) | (1,114) |
| **Total Expenses** | **(38,991)** | **(4,434)** |
| Earnings before interest, taxes, depreciation & amortisation | 10,514 | (428) |
| Depreciation and amortisation | (864) | (4) |
| Interest Income | 481 | 1 |
| **Profit before income taxes** | **10,131** | **(431)** |
| Income tax expense | (1,056) | - |
| **Net income/(loss) for the period** | **9,075** | **(431)** |
| Earnings/(loss) per common share | | |
| Basic | $0.09 | ($431,000) |
| Diluted | $0.09 | ($431,000) |



      

# Proforma Financial Information

|  | Q4 2005 | Fiscal 2005 Proforma | Fiscal 2004 Proforma |
|---|---|---|---|
| Royalty revenue | $ 25,379 | $ 87,190 | $ 45,222 |
| Other revenue | 92 | 397 | 43 |
| **Total Revenue** | 25,471 | 87,587 | 45,265 |
| Operating Costs | (16,189) | (55,745) | (29,894) |
| General and administrative expenses | (1,666) | (4,819) | (1,114) |
| **Total Expenses** | (17,855) | (60,564) | (31,008) |
| Earnings before interest, taxes, depreciation & amortisation | 7,616 | 27,023 | 14,257 |
| Depreciation and amortisation | (483) | (1,829) | (1,487) |
| Interest Income | 318 | 797 | 6 |
| Profit before income taxes | 7,451 | 25,991 | 12,776 |
| Income tax expense | (745) | (2,642) | (1,321) |
| Net income for the period | $ 6,706 | $ 23,349 | $ 11,455 |
| Earnings per share |  |  |  |
| Basic | $ 0.04 | $ 0.14 | $ 0.07 |
| Diluted | $ 0.04 | $ 0.13 | $ 0.06 |

*Proforma results have been prepared on the basis that the July 28, 2005 purchase of intellectual property and the terms of the 29 July 2005 re-negotiated eWorld license agreement had occurred on January 1st, 2004.*

 

EXCAPSA

      

# Key Metrics

| All $ are US$ | | 2005 | 2004 | +/- |
|---|---|---|---|---|
| Active real money players | FY 05 vs. FY 04 | 242,246 | 137,682 | +76% |
| | Dec 05 vs. Dec 04 | 98,878 | 61,133 | +62% |
| Raked hands played | Dec 05 vs. Dec 04 | 13,289,611 | 7,879,576 | +69% |
| Average daily gross revenue (rake & tournament fees) | FY 05 vs. FY 04 | $302,574 | $163,077 | +86% |
| Average daily net revenue* | FY 05 vs. FY 04 | $239,964 | $123,676 | +94% |

*Proforma results have been prepared on the basis that the July 28, 2005 purchase of intellectual property and the terms of the 29 July 2005 re-negotiated eWorld license agreement had occurred on January 1st, 2004.



       

# Cumulative Customer Accounts



## Licensees' Customer Accounts
### (including play money)

2005 vs. 2004: 85% growth

318,293 (2003)
914,272 (2004)
1,694,576 (2005)

## Registered Real Money Players
### (all time revenue generators)

2005 vs. 2004: 97% growth

59,545 (2003)
161,783 (2004)
317,959 (2005)

EXCAPSA

# New Unique Revenue Generators Per Month



















EXCAPSA
SOFTWARE INC

# Total Unique Monthly Revenue Generators



| | |
|---|---|
| 110,000 | |
| 105,000 | |
| 100,000 | |
| 95,000 | |
| 90,000 | |
| 85,000 | |
| 80,000 | |
| 75,000 | |
| 70,000 | |
| 65,000 | |
| 60,000 | |
| 55,000 | |
| 50,000 | |

Oct-04 Nov-04 Dec-04 Jan-05 Feb-05 Mar-05 Apr-05 May-05 Jun-05 Jul-05 Aug-05 Sep-05 Oct-05 Nov-05 Dec-05








**Magic Palace Poker**




**CardPlayer POKER**



DVBPOKER.COM



**Choose Your Charity!**
Play poker and support the registered charity of your choice.
$1,000 ADD-ON BONUS!



**Bellagio Seat GIVEAWAY**

**ADD-ON TOURNAMENTS**
Play one today!

DEALER




**EXCAPSA**

       

# Summary

- Outstanding 2005 results

- Successful IPO with placing proceeds of £56.2 and gross proceeds of £26.1 million for the company

- Strong cash generation from operating activities

- Poker network one of the largest worldwide

- Database platform upgrade allows for new network games, increased scalability and improved site reliability

- Cross-selling opportunities

- Online poker market continues to grow

- Board and management are confident with prospects for the current financial year





# EXHIBIT C

9.

Court File No.  06-CL-6752

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST

B E T W E E N :

JAMES RYAN

Applicant

- and -

EXCAPSA SOFTWARE INC.

Respondent

## AFFIDAVIT OF DANIEL FRIEDBERG
(sworn November 27, 2006)

I, DANIEL FRIEDBERG, of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY:

### Background

1.     Up to November 24, 2006, I was the Secretary of Excapsa Software Inc. ("Excapsa").  This application has been brought by James Ryan ("Ryan"), who was, at relevant times, the Chief Executive Officer and a director of Excapsa.  Shortly after a special meeting of shareholders on November 24, 2006, Ryan had to fly to Europe on business and was therefore unable to swear this affidavit today.  However, as an of Excapsa who was directly involved in the corporate transactions that form the subject matter of this application, I have knowledge of the matters to which I depose herein.

2.     Excapsa is a corporation incorporated in April 2004 and later continued under the *Canada Business Corporations Act* ("CBCA").

3.     Since February 9, 2006, Excapsa has only been a holding company.  Its business operations were, at relevant times, carried on by the following direct and indirect subsidiaries (the "Subsidiaries"):

(a)     Excapsa Services Inc., an Ontario corporation;

November 27, 2006 - 1:17 PM Legal*2442925.4

- 2 -

*10*

(b)    Game Theory Ltd., a Malta corporation;

(c)    Game Theory Holdings Ltd., a Malta corporation; and

(d)    Game Theory Services Ltd., a Malta corporation.

4.    Since its incorporation, Excapsa and the Subsidiaries (collectively, the "Excapsa Group") developed, maintained, and marketed online gaming software applications. The main products of the Excapsa Group were multi-player real time Internet-enabled poker software, its back office e-cash and reporting software, and the poker network. The Excapsa Group licensed this software to a variety of third parties that operate both real money and "play money" online gaming ventures.   Most of the revenue of the Excapsa Group came from licensing fees for its software and the domain names owned by it.

5.    On February 13, 2006, Excapsa issued a Placement Memorandum for a private placement of approximately 23 million shares at a price of 110 U.K. pence per share. Concurrent with the private placement, Excapsa applied for and obtained admission of its shares to trading on the Alternative Investments Market of the London Stock Exchange ("AIM").   Excapsa shares began trading on AIM on February 16, 2006. Excapsa is structured as a mutual fund corporation for Canadian legal purposes.

6.    In the fiscal year ended December 31, 2005, the Excapsa Group generated net income of US$9,075,000 on revenue of US$49,505,000.  Attached hereto and marked as Exhibit "A" is a true copy of Excapsa's consolidated fiscal 2005 financial statements, which include comparative figures for the period from April 28 to December 31, 2004.

7.    For the six months ended June 30, 2006, the Excapsa Group had revenue of US$54,195,000 and net income of US$15,112,000.  Attached hereto and marked as Exhibit "B" is a true copy of the Excapsa Group's consolidated unaudited internal financial statements for the six months ended June 30, 2006.

8.    Beginning in September 2006, the landscape for Internet gaming changed radically.  On September 30, 2006, the United States Congress passed the SAFE Port

- 3 -

Act (the "SPA").  Subsequently, on October 13, 2006, the SPA was signed into law by President Bush.  Title VIII of the SPA, entitled Unlawful Internet Gambling Enforcement, prohibited online gaming service providers from accepting credit card or other payments originating in the United States.  It also prevented United States financial institutions from facilitating Internet gaming anywhere in the world.  Although the Excapsa Group was not directly engaged in Internet gambling activities—in fact, its licensees were the ones that carried on the business—Excapsa recognized that the SPA would certainly have a material negative effect on the business of the Excapsa Group.

9.      After extensive review, including consultation with its professional advisors, the board of directors of Excapsa ultimately determined that the best way to maximize shareholder value would be to sell Excapsa's operating assets as a going concern.  I understand that several other public corporations facing similar circumstances elected to discontinue their operations.  Accordingly, on October 12, 2006, Excapsa entered into a sale transaction with Blast Off Limited (the "Buyer"), a limited liability company in Malta.   The sale was structured as a share transaction.   Excapsa sold all of the outstanding common shares of its operating Subsidiaries, Excapsa Services Inc. ("ESI") and Game Theory Holdings Ltd. ("GTHL"), for an aggregate purchase price of US$130,000,000 (the "Purchase Price").

10.     The sale transaction was effective on October 12, 2006, subject only to the approval and ratification by Excapsa's shareholders.  Game Theory Ltd. and Game Theory Services Ltd. are wholly-owned subsidiaries of GTHL, so both of these companies were indirectly included in the sale. Attached hereto and marked as Exhibit "C" is a true copy of the Stock Purchase Agreement between Excapsa and the Buyer (the "Agreement"), restated to reflect a number of amendments.

11.     The Buyer paid Excapsa an initial US$5 million on account of the Purchase Price and has issued a promissory note (the "Note") for the balance of US$125,000,000. Attached hereto and marked as Exhibit "D" is a true copy of the Note restated to reflect a number of amendments.

12.     The Note is payable as follows:

- 4 -                                                                12.

(a)     one instalment of US$5,000,000 was due on or before October 17, 2006—
        this amount has been paid;

(b)     one instalment of U.S. $500,000 is due on or before November 22, 2006—
        this amount has been paid;

(c)     12 instalments of U.S. $1,000,000 must be paid on the last date of each
        calendar month commencing on December 31, 2006 and ending on
        November 30, 2007; and

(d)     US$2,000,000 per month must be paid commencing on December 31,
        2007 and continuing on the last day of each calendar month until the Note
        is paid in full.  As such, the Note will be fully repaid by May 31, 2012, five-
        and-one-half years from now.

13.    The Note also provides that interest accrues on the outstanding amount, from
and after December 31, 2006, at the rate of 1 percent per month, but no interest
accrues in any month when the Buyer elects to pay additional outstanding principal
equal to at least one-half of the then required monthly instalment payment.  The Note is
secured directly and indirectly by the common shares of ESI and GTHL and certain
other security.

14.    Under the Agreement, ESI and GTHL also paid over to Excapsa all of their cash
and accounts receivable as of October 12, 2006 as well as a portion of prepaid
expenses.

**Approval of Sale and Other Matters**

15.    As I have deposed above, the sale of the shares of ESI and GTHL was
completed and effective on October 12, 2006, subject only to the approval and
ratification by Excapsa's shareholders.  Attached hereto and marked as Exhibit "E" is a
true copy of Excapsa's press release dated October 12, 2006, which summarizes the
transaction.

- 5 -

13.

16.    As a result of the sale of the shares of Excapsa's subsidiaries to the Buyer, Excapsa had no other operating business.  It only had cash in the bank, accounts payable, and the right to receive payments under the Note.  The board of directors of Excapsa determined that, since there was no other business venture that the company could reasonably undertake to maximize shareholder value, Excapsa should be voluntarily dissolved, its debts satisfied, and any remaining proceeds distributed to shareholders.

17.    Further, under the AIM exchange rules, a company's shares must be delisted when the company ceases to carry on an active business.  Since such situation has occurred here, Excapsa was required to make application to cancel the admission of its shares to trading on AIM.

18.    On October 26, 2006, the board of directors of Excapsa met.  At that meeting, the board decided to call a special meeting of shareholders for November 24, 2006 for the following purposes:

   (a)    Obtain an affirmative vote of not less than sixty-six-and-two-thirds percent of the votes cast at such special meeting to ratify and approve a resolution authorizing the completion of the sale transaction with the Buyer in accordance with the Agreement.

   (b)    Obtain an affirmative vote of not less than 75 percent (as required by AIM rules) of the votes cast at such special meeting to ratify and approve the cancellation of the admission of its shares to trading on AIM, thereby resulting in Excapsa ceasing to be a publicly-traded company.

   (c)    Approve a plan of liquidation and distribution (the "Plan"), which is to become effective on the date that the sale transaction between Excapsa and the Buyer is approved by shareholders.  The Plan provides for a voluntary liquidation and dissolution under section 211 of the CBCA (the "Liquidation"), which includes the following steps:

(i)     on November 30, 2006, Mintz & Partners Limited would be appointed as liquidator under the CBCA (the "Liquidator"), with such appointment being subsequently confirmed by the Ontario Superior Court (the "Court") later that day;

(ii)    An application will be brought to the Court to have the Liquidation continued under court supervision;

(iii)   All employees and independent contractors of Excapsa would be terminated, other than those individuals that the Liquidator required to retain to assist with the Liquidation;

(iv)    The Liquidator would be empowered to, amongst other matters:

    (A)    gather up and realize upon the assets of Excapsa, including ongoing payments made under the Note;

    (B)    maintain such reserves as are reasonably necessary to cover contingent liabilities of Excapsa,

    (C)    pay debts of Excapsa (including taxes), and

    (D)    distribute any remaining amounts to shareholders, whether by interim or final distributions; and

(v)     Appoint inspectors to supervise and assist the Liquidator with the implementation of the Plan.

19.     The Management Information Circular of Excapsa issued in connection with the meeting also proposed that resolutions be approved:

(a)     changing the name of the corporation to 6356095 Canada Inc.;

(b)     authorizing Excapsa to reduce stated capital of the corporation and distribute the amount of any such reduction to shareholders;

- 7 -

15.

(c)     dispensing with the appointment of an auditor and the compliance with the audit requirements of the CBCA if permitted thereunder; and

(d)     approving the acts of the directors and officers to date.

20.     Attached hereto and marked as Exhibit "F" is a true copy of the Notice of Meeting.  Attached hereto and marked as Exhibit "G" is a true copy of the Management Information Circular in respect of the November 24, 2006 Special Meeting of Shareholders (the "Special Meeting").  Attached hereto and marked as Exhibit "H" is a true copy of the Plan (in the form that it was amended and approved at the November 24, 2006 meeting).  Attached hereto and marked as Exhibit "I" is a true copy of the letter to shareholders that accompanied the materials for the November 24, 2006 special meeting.

21.     The package of materials sent to shareholders in connection with the meeting included Exhibits A, B, C, D, F, G, H, and I, as well as the following items:

(a)     a *pro forma* balance sheet for Excapsa as at June 30, 2006, which shows the effect that the sale to the Buyer would have had if the transaction had occurred at that date (a copy of which is attached as Exhibit "J");

(b)     a form of proxy (a copy of which is attached as Exhibit "K");

(c)     a copy of section 190 of the CBCA, which sets out the right of a shareholder to dissent in respect of the sale transaction (a copy of which is attached as Exhibit "L").

**Approval of Resolutions**

22.     The Special Meeting was held on November 24, 2006 at the offices of Cassels Brock & Blackwell LLP.  Shareholders holding 121,738,497 shares of Excapsa, being 63 percent of the total issued and outstanding shares of the company, were present at the meeting either in person or by proxy.  Each of the above-noted resolutions was voted upon at the meeting and each and every resolution was passed without any negative votes.  In short, all of the resolutions passed unanimously.

- 8 -

16.

23.    Attached hereto and marked as Exhibit "O" is a true copy of the Final Scrutineers' Report issued by Computershare Investor Services Inc. with respect to the November 24, 2006, special meeting of shareholders.

24.    Following the Special Meeting, Excapsa took steps to begin the Liquidation under section 211 of the CBCA.  First, Excapsa filed a Statement of Intent to Dissolve with the Director appointed under the CBCA pursuant to Section 211(4) of the CBCA.  This statement was filed effective November 24, 2006 (and a copy thereof is attached hereto and marked as Exhibit "M").

25.    As authorized by the resolution at the Special Meeting, Excapsa will formally change its name to 6356095 Canada Inc. within the next few days and, in any event, prior to the hearing of this application.  Such name change will require an amendment to the title of proceedings.

26.    As of November 24, 2006, the Director appointed under the CBCA issued a Certificate of Intent to Dissolve (a copy of which is attached as Exhibit "N") in accordance with section 262 of the CBCA (the "Certificate").  A Certificate has been issued and therefore the dissolution and liquidation process has begun.

**Future Steps**

27.    As I have deposed above, it will not be possible to completely wind-up the affairs of Excapsa until the Buyer fully pays all amounts owing under the Note.  Since the Note provides for payments up to and including May 31, 2012, the affairs of Excapsa will not be finalized for more than five and one-half years (assuming that the Buyer does not make pre-payments under the Note).

28.    Given that there is no active business of Excapsa and the fact that its shares will no longer trade on the AIM market after approximately December 4, 2006, the officers do not wish to maintain their current positions.  The officers will resign effective upon the Court granting an order for supervision of the Liquidation.  Although Ryan and two other individuals will at least initially act as directors in order to assist the Liquidator, the directors may also resign during the course of the Liquidation.  As such, the order being

sought contemplates that the powers that the directors and shareholders otherwise would have held will be vested in the Liquidator upon the granting of this order, subject to the right of the Liquidator to temporarily or permanently delegate back in writing some or all of the powers that the directors and shareholders formerly had.

29.   The directors have resolved to ensure that Excapsa's Liquidation will proceed on a fair, orderly, and transparent basis.

30.   In that regard, the Plan envisions court supervision of the Liquidation, with all material steps taken by a court-confirmed liquidator who is assisted by inspectors. Under the Plan, which was approved by the shareholders on November 24, 2006, Gail Gleed, who was the Chief Financial Officer of Excapsa up to that date, John K. Fitzgerald, an independent lawyer, and Ryan were appointed as inspectors of the Liquidation (collectively, the "Inspectors").   The role of the Inspectors will be to supervise and assist the Liquidator with the Liquidation.  In the event that an Inspector resigns, the Plan authorizes the Liquidator (or failing that, any shareholder can apply to the court) to appoint a replacement Inspector.  The Inspectors also have the right to apply to the court to appoint a replacement Liquidator if they believe that circumstances require it.  The Inspectors also will have the authority to apply to the court for directions.

**Current Financial Status of Excapsa**

31.   Taking into account the US$10,500,000 million paid to date under the Agreement as well as the ongoing expenses that Excapsa has paid (such as rent, utilities, and salaries), Excapsa now has cash on hand of approximately US$60,000,000.

**Liabilities of Excapsa**

32.   Although it is in the interests of Excapsa shareholders to receive the proceeds of the transaction as soon as Excapsa receives such proceeds, Excapsa wishes to make sure that it properly provides for and pays all of its liabilities, as is required by the CBCA.

- 10 -

33.   The structure of Excapsa and of the Agreement, as well as the nature of its business up to October 12, 2006, all minimize the likelihood of claims being made against Excapsa.   First, all operations were undertaken by the Subsidiaries and, therefore, it was those Subsidiaries which incurred most of the liabilities of the business. Since Excapsa sold the shares of those Subsidiaries to the Buyer, the ongoing and future liabilities of the business remain with the Subsidiaries.

34.   Excapsa has paid all of its known accounts payable which existed up to November 24, 2006. Excapsa has also prepaid its rent on its business premises up to December 31, 2006, the date on which it will vacate such premises.   Thereafter, the Liquidation will operate from the premises of the Liquidator, which will not require any ongoing rent to be paid.

35.   Employee wages are paid up to date and all employees have been offered a compensation package in relation to their entitlement upon termination.   All employees have accepted such packages, received the required payment, and signed a comprehensive release in favour of Excapsa.

36.   Excapsa will have to pay its own current and future income tax liability as well as tax liability (up to October 12, 2006) of certain of its operating subsidiaries.

37.   Excapsa does not have any other ongoing liabilities.

**Claims Barring Process**

38.   Although there are unlikely to be many claims against Excapsa, the board of directors recognized that any party that is owed money by Excapsa or who has an actual or potential claim against Excapsa or its officers or directors should have the opportunity, and be required, to bring such claim forward as soon as possible for adjudication.

39.   To allow claims to be asserted and adjudicated, Excapsa seeks a claims-barring process under the supervision of the court.   Since section 221(b)(iii) of the CBCA contemplates that creditors should be required to assert their claims against a company

in liquidation within two months of publication of a notice of dissolution, Excapsa seeks an order requiring all claimants to assert their claims on or before February 15, 2007. Excapsa intends to publish a notice concerning the liquidation and the appointment of the Liquidator in the national edition of the *Globe and Mail*, the *Wall Street Journal,* the *Times of London,* as well as in a newspaper of general circulation in Malta.

40.     Excapsa also intends to give notice of the Liquidation to, and seek any claims from, shareholders, trade creditors, employees, and all other persons who may potentially have claims against Excapsa or its directors.

41.     Through this claims-barring process, Excapsa wishes to bar all claims based on facts existing up to the date that the Liquidation is continued under court supervision that are not asserted on or before February 15, 2007 ("Pre-Filing Claims").   The Liquidator will run a separate process for any claims that may arise after the date that court supervision begins ("Post-Filing Claims").

42.     Since Excapsa does not want to implement a cumbersome claims adjudication process if one is not necessary, it seeks an authorization permitting the Liquidator to review and pay or settle claims up to $100,000 per claim, if the Liquidator in its discretion believes it can do so.  To the extent that there are unresolved claims, or claims above this monetary threshold, Excapsa wishes the Liquidator to return to court upon subsequent motion for an order establishing a claims determination process. The details of that process will, of course, depend on the volume and size of the claims received by the claims bar date.

43.     The order being sought also includes a term requiring Excapsa to withhold US$5,000,000 as a general reserve to cover any claims that may be advanced against the Liquidator, Excapsa, and their officers, directors, employees and independent contractors.

**Interim Distribution**

44.     Given the significant cash that Excapsa has on hand, it seeks an order permitting an interim payment to shareholders in the aggregate amount of US$26,000,000, to be

- 12 -

20·

paid on a *pro rata* basis in an equal amount per share. This amount will be paid as a dividend to shareholders of record as of December 8, 2006 and designated as a capital gains dividend for tax purposes.

45.     This payment would be made before the claims bar date and likely prior to December 31, 2006.

46.     Even after making this payment, Excapsa would still have remaining cash on hand of approximately US$34 million, which I understand from Excapsa's tax advisors will be significantly in excess of Excapsa's accrued tax liability. I now anticipate such tax liability to be significantly less than CAD$8 million (which amount will be further reduced by applicable refunds and credits). As such, the payment of this capital gains dividend should not in any way impair Excapsa's ability to pay the tax authorities or other creditors.

**Further Distributions**

47.     The Agreement requires monthly payments of either US$1,000,000 or US$2,000,000 from the Buyer. To the extent that it does not need to pay, or hold a reserve for, liabilities (including income tax liabilities and claims asserted in the claims bar process), the Liquidator is seeking the authority to make monthly distributions to shareholders as well as special distributions where warranted.

- 13 -

21.

**Former Role of Mintz**

48.    As I have deposed above, Excapsa wishes the appointment of Mintz & Partners Limited as Liquidator to be ratified.  It should be noted that a related entity, Mintz & Partners LLP, is the auditor of Excapsa, but the board of directors of Excapsa does not believe that there would be any conflict of interest in having Mintz & Partners Limited confirmed as Liquidator.   In fact, based on Mintz & Partners LLP's knowledge of Excapsa, the board of directors believes that the appointment of Mintz & Partners Limited will benefit and facilitate the liquidation process.

**Conclusion**

49.    For the reasons indicated above, I believe that it is in the best interest of all stakeholders that the Liquidation of Excapsa proceed under supervision of the court and, in that regard, an order substantially in the form of the draft order contained in Excapsa's application record should issue.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario, on November 27, 2006.

Commissioner for Taking Affidavits

DANIEL FRIEDBERG